**In re Michael Gay COOK, Debtor.**

**HUBBELL STEEL CORPORATION, Plaintiff,**

**v.**

**Michael Gay COOK, Defendant.**

**Caroline COOK, Plaintiff,**

**v.**

**HUBBELL STEEL CORPORATION and Dale Industries, Inc., Defendants.**

**Bankruptcy No. 88–62351.**
**Adv. Nos. A–89–6043, A–90–6018.**

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

March 19, 1991.

William Chris Wolffarth, True, Rohde & McLain, Dallas, Tex., for Hubbell Steel Corp.

Michael Gay Cook, pro se.

Joseph E. Ackels, Dallas, Tex., for Caroline Cook.

## OPINION

DONALD R. SHARP, Bankruptcy Judge.

This matter came on for consideration of Plaintiff, Hubbell Steel Corporation's Complaint objecting to discharge pursuant to a regularly scheduled hearing on May 17, 1990, in Tyler, Texas. Also before the Court is a removed state court action filed by Plaintiff, Caroline Cook, alleging various state law violations by Defendants, Hubbell Steel Corporation and Dale Industries. This opinion constitutes findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and disposes of the issues presented to the Court.

### FACTUAL AND PROCEDURAL BACKGROUND

Michael Gay Cook, hereinafter ("Debtor"), filed a Petition in Chapter 7 in this Court on October 25, 1988. On January 20, 1989, Hubbell Steel Corporation, hereinafter ("Hubbell"), filed a Complaint Objecting to Discharge of the Debtor. The Complaint of Hubbell was amended on September 1, 1989. The Complaint of Hubbell relates to allegations that Debtor's discharge in bankruptcy should be denied pursuant to § 727(a)(2), (3) and (5) in addition to alleging that Debtors actions vis-a-vis Hubbell rise to the level to deny Debtor a discharge of the debt owed to Hubbell pursuant to § 523(a)(4).

Debtor's difficulties with Hubbell began in and around 1984 while Debtor, as an insurance agent, was writing policies for Hubbell and some of its related businesses. From the testimony, it is clear that in and around late 1984 and early 1985, a dispute began to arise between Debtor and Hubbell when it was discovered that even while binder insurance coverage was issued to Hubbell the insurance policies themselves

were never issued. The basic reason for the non-issuance of the policies was that the issuing companies claimed not to have received the premium payments submitted by Hubbell to Debtor.[1] In the subsequent course of events, Hubbell's insurance coverage was promptly cancelled which forced Hubbell to seek coverage elsewhere at a significantly higher cost.

The dispute between Debtor and Hubbell culminated in the filing of a state court lawsuit brought by the issuing insurance company against Hubbell and Debtor. Hubbell cross-claimed Debtor complaining that Debtor misappropriated the insurance premiums paid by Hubbell. Debtor failed to contest the action and default was entered. On February 29, 1988, the 162nd Judicial District Court for Dallas County, Texas, finalized an interlocutory default judgment issued against Debtor by Hubbell. The judgment awarded monetary damages to Hubbell for damages suffered as a result of Debtor's actions.

During the initial stages of Debtor's difficulties with Hubbell, Debtor was residing in a Winter Park, Florida property which he had purchased on June 15, 1983. On August 23, 1985, Debtor transferred the property, hereinafter ("the Florida property"), to his daughter, Caroline Cook, as a wedding present. The gift was entirely gratuitous, no consideration being exchanged and Debtor continued to make the mortgage payments on the property. Even though the title to the Florida property was now held by Caroline Cook, Debtor continued to live there. From the testimony, it appears that not only did Caroline Cook never live in the Florida property but that it is questionable whether she even saw it. Debtor had earlier demonstrated his largesse in October 1984 when Debtor purchased a small rural property in Henderson County, Texas. The property consisted of a mobile home and some attached acreage. Again, the property was subsequently transferred to Caroline Cook for no consideration and it is undisputed that record title

to the Henderson County property is vested in Caroline Cook.

During the period between 1984—1988, Debtor's financial well being had been on a steady decline, much of which can be attributed to Debtor's difficulties with Hubbell as well as a general down turn in the insurance market in which Debtor operated. As a result, Debtor began to have difficulty paying the mortgage on the Florida property that he had given to his daughter, Caroline Cook. It appears from testimony that Debtor discussed this dilemma with Caroline Cook and that a decision was made to sell the property. Subsequently, Caroline Cook granted Debtor a written power of attorney authorizing him to sell the Florida property. The sale was completed in late December 1987 yielding the sum of approximately $57,000.00 in proceeds.

By this time, Debtor's economic health was in dire straits. Debtor's testimony, as corroborated by Caroline Cook, indicates that an informal understanding was reached between the parties that the proceeds from the sale of the Florida property would be used by Debtor at Debtor's discretion. No written document evidencing a loan was ever entered into and Caroline Cook testified that she never expected that Debtor was to repay her notwithstanding Debtor's statement of his intention to do so. The only agreement Caroline Cook requested of Debtor was that enough funds be set aside to pay any tax obligations arising from the sale of the Florida property.

After the sale of the Florida property, Debtor began to reside in the Henderson County property he had purchased for Caroline Cook in October 1984. During this time, Debtor lived off of the proceeds of the sale of the Florida property while he pursued a writing career. During this time, Hubbell was still in the process of attempting to collect its judgment of February 29, 1988. During a July 8, 1988, Hubbell deposition, Debtor testified that approximately $33,000.00 of the proceeds remained at the Henderson County proper-

---

1. Debtor disputes this contention of Hubbell. Debtor attributes the non-issuance of the policies to organizational difficulties within the issuing companies.

ty. Further testimony revealed that after the sale, Debtor had converted the proceeds into cash in denominations of one hundred dollar bills. This cash was kept in a portable safe in the mobile home on the Henderson County property. The testimony is clear that Caroline Cook at no time ever personally witnessed the existence of the cash proceeds. All of Caroline Cook's knowledge concerning the proceeds was gained through discussions with Debtor. Furthermore, only Debtor had access to the safe on the Henderson County property which allegedly contained the proceeds.

Buoyed by the knowledge of the existence of proceeds on the Henderson County property, Hubbell appealed to the 162nd Judicial District Court of Dallas County, Texas, Judge Katherine K. Crier, presiding, to issue an order, hereinafter ("the turnover order" or "order"), ordering production by Debtor of the warranty deed to the Henderson County property, payment into the registry of the court of $57,000.00 (the proceeds of the sale of the Florida property), and the production of other miscellaneous items.[2]

On or following the day of the issuance of this order, several corporate representatives of Hubbell and Dale and their employees and agents, sought the assistance of the Henderson County Sheriff's office to gain entry to the Henderson County property. The Hubbell representatives were at that time informed by a deputy sheriff of Henderson County that the order did not authorize such entry. In response, the attorney for Hubbell and Dale contacted Judge Crier who interliniated her order of September 20, 1988, to permit the Sheriff of Henderson County to remove any locks hindering entrance provided that the property was resecured upon the exit of the Hubbell party. The deputy sheriff of Henderson County complied with this order.

On or about September 20, 1988, Hubbell representatives examined the Henderson County property and removed several items. During their search, the safe that Debtor alleges contained the proceeds of the sale of the Florida property was discovered. The Hubbell representatives immediately removed the safe from the premises and took it to a local locksmith where it was opened. The locksmith unlocked but did not witness the opening of the safe or at any time see its contents. The safe contained no money.

In direct response to the actions of Hubbell, Caroline Cook subsequently filed a petition in the 14th Judicial District Court of Dallas County, Texas, alleging numerous state law causes of action including conversion, conspiracy, wrongful trespass, invasion of privacy, abuse of process, wrongful intrusion, wrongful debt collection and fraud on the state court. The sum and total of these state law allegations stem from the contention of Caroline Cook that the Henderson County property as well as the proceeds of the sale of the Florida property were hers and that Hubbell's actions were clearly unlawful.

By late 1988, Debtor's difficulties culminated in the filing of his petition in Chapter 7. On January 20, 1989, Hubbell filed a complaint objecting to the discharge of Debtor which was amended on November 1, 1989. The complaint of Hubbell alleges in pertinent part that Debtor has engaged in a conspiracy with his daughter, Caroline Cook, to conceal assets of the Debtor from the estate. The touchstone of this argument is the dispute over the ownership of the proceeds from the sale of the Florida property. Since these same proceeds were the subject of a similar dispute between Hubbell and Caroline Cook in state court Hubbell removed the state court action to the bankruptcy court on or about September 12, 1989. Later, on March 29, 1990, this Court entered an order consolidating both of these cases. On the date set for the trial of this combined adversary proceeding, the Court entertained a Motion for Remand filed by Caroline Cook. After con-

---

**2.** Reference to this order as a "turnover order" is somewhat of a misnomer since Hubbell's reliance on the order to justify its actions on the Henderson County property is arguably mis-

placed. However, since all the parties refer to this order as a "turnover order" the Court will also employ that term of description.

sideration of the arguments of counsel, the Court announced orally that it was prepared to remand all of the state court causes of action with the exception of the causes of action alleged by Caroline Cook for conversion and wrongful debt collection. The Court held that it was unable to remand these causes of action due to the possibility of conflicting rulings should two separate courts be presented with the issue as to the ownership of the proceeds of the Florida property. Accordingly, this Court denied remand of the two causes of action solely as to the issue of the ownership of the proceeds.

### DISCUSSION OF LAW

In Hubbell's Complaint objecting to discharge of Debtor, Hubbell alleges four grounds for the denial of discharge including 11 U.S.C. § 727(a)(2), (4) and (5) in addition to alleging an 11 U.S.C. § 523(a)(4) grounds for objecting to the discharge of Debtor's indebtedness to Hubbell. The Court will first address the allegation that Debtor should be denied a discharge under 11 U.S.C. § 727(a)(2). Under § 727(a)(2)(A), a Debtor is entitled to a discharge unless:

(2) The debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;

In all complaints objecting to discharge, the party objecting to discharge is charged with carrying the burden of proof. Bankruptcy Rule of Procedure 4005, 11 U.S.C. Case law is uniform that exceptions to discharge are to be narrowly construed against the creditor and in favor of the debtor. *In re: Nasr*, 120 B.R. 855 (Bkrtcy. S.D.Tex.1990); *In re: Holmes*, 121 B.R. 505 (Bkrtcy.N.D.Tex.1990). However, one preliminary issue that this Court must first address is the issue of the appropriate standard of proof that a creditor is required to meet in order to deny a debtor a discharge in bankruptcy.

Throughout much of the 1980s, it seems clear to this Court, without a need for a recitation of case law, that the majority of courts decided discharge and dischargeability issues utilizing the clear and convincing standard of proof. The Court notes that it also subscribed to this majority position on numerous occasions in the past. However, in spite of what seemed to be a clear majority position, there were several courts which held that the appropriate standard of proof in dischargeability and discharge matters was in fact the preponderance of evidence standard. *In re: Essres*, 122 B.R. 422 (Bkrtcy.D.Colo.1990).

This Court is of the opinion that any indecision as to the appropriate standard of proof has been resolved by the recent decision of the Supreme Court in *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) in which the Court held that the appropriate standard of proof in 11 U.S.C. § 523 matters is the preponderance of the evidence standard. After a close examination of the reasoning employed by the court in *Grogan v. Garner* this Court is of the opinion that the preponderance of the evidence standard of proof is also appropriate in all 11 U.S.C. § 727 matters. First, this Court notes that the Supreme Court was influenced by the silence of the legislative history of § 523 as it related to the appropriate standard of proof. In the Supreme Court's opinion, "silence is inconsistent with the view that Congress intended to require a special, heightened standard of proof." *Id.,* 111 S.Ct. at 659. This Court is unaware of any legislative history establishing conclusively that a heightened clear and convincing standard of proof is required in § 727 cases hence this Court ascribes to the view of the Supreme Court in extrapolating that a heightened standard of proof is inconsistent in the face of legislative silence.

A second influential consideration for this Court is the tenor of the *Grogan v. Garner* decision. In addressing the argument that a lower standard of proof would violate the "fresh start" policy of the Bank-

ruptcy Code, the Court carefully balanced this goal with the interest of the creditors involved in the bankruptcy process. The result of this balance, "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Id.* at 659. The Court added that it thought it was "unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest of giving perpetrators of fraud a fresh start over the interest of protecting the victims of fraud." *Id.* at 659. This Court is of the opinion that those motivations, while stated in the context of § 523 are equally applicable to § 727 causes of action. In fact, since the majority of § 727 causes of action deal with upholding the integrity of the bankruptcy process rather than serving as a protective device for wronged creditors this Court is of the opinion that a lower standard of proof may be even more appropriate in the context of § 727. Thus, this Court will examine Hubbell's § 727(a)(2)(A) complaint using the preponderance of the evidence standard of proof.

For a creditor to meet his burden in denying a debtor his discharge pursuant to § 727(a)(2)(A) the creditor's burden of proof requires that the creditor show:

1. That the act complained of was done at a time subsequent to one year before the date of the filing of the petition;
2. With actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;
3. That the act was that of the debtor or his duly authorized agent;
4. That the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

4 *Collier on Bankruptcy* para. 727.02 at 727–11 (15th Edition 1990).

Of significant concern for this Court, at the regularly scheduled hearing, was the fact that since the transfer of the Florida property from Debtor to Caroline Cook occurred over three years prior to the date Debtor filed his petition in Chapter 7 that the one year statute of limitations seemed to operate as a fatal absolute bar to Hubbell's proof of the § 727(a)(2)(A) complaint. In response to the Court's queries, counsel for Hubbell advanced to the Court the theory that Debtor had acted in concert with Caroline Cook in a conspiracy to transfer assets of the Debtor out of the creditors reach through a series of sham transactions and that such actions fall within the purview of § 727(a)(2)(A). However, counsel for Hubbell was unable to produce any case law to support this assertion other than argument that a conspiracy existed. The Court's own research into the grounds, if any, that could support a denial of a discharge to a debtor who had transferred property prior to one year before the filing of his bankruptcy, indicates that Hubbell was trying to articulate the continuing concealment doctrine. *In re: Olivier*, 819 F.2d 550 (5th Cir.1987); *Matter of Kauffman*, 675 F.2d 127 (7th Cir. 1981). In *Olivier*, Debtors transferred a home to a family member two days after Debtors' involvement in an auto accident which injured another party. The transfer from debtors was in the nature of a sham transaction and the funds ostensibly being used to purchase the home were returned to debtors a few days after the purported sale. At all times after the sale, debtors continued to live in the home, paid no rent and maintained the home as their own. Approximately seven years later, debtors filed for bankruptcy under Chapter 7. Debtors' discharge was denied pursuant to § 727(a)(2) and debtor prosecuted an appeal to the circuit level. The court held that an exception to the seemingly absolute one year bar contained in § 727(a)(2) is met when a debtor continues a "concealment of their secretly retained interest in the property." *Id.* at 554–555. Accordingly, "the concealment of an interest in an asset that continues, with the requisite intent, into the year before bankruptcy constitutes a form of concealment which occurs within the year before bankruptcy and, therefore, such concealment is within the reach of § 727(a)(2)(A)." *Id.* at 555. An earlier de-

cision supporting this rationale was the Seventh Circuit's opinion in *Matter of Kauffman,* 675 F.2d 127, 128 (7th Cir.1981) in which the court held that "the transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment." *Id.* at 128. Thus, it appears to this Court that even though a transfer may occur prior to the one year limitations period in § 727(a)(2)(A) that fact in and of itself is not enough to defeat a complaint to deny discharge.

After a review of the numerous cases that have addressed the continuing concealment doctrine, several factors appear which mitigate in favor of a finding that a debtor has engaged in a continuing concealment. In *Matter of Kauffman,* 675 F.2d 127 (7th Cir.1981) the court found that debtor engaged in a continuing concealment by continuing to live in the home and make mortgage, tax and insurance payments after the date of the purported transfer. In *In re: Olivier,* 819 F.2d 550 (5th Cir.1987) continuing concealment was found because debtors continued to live in and maintain the home subsequent to the alleged transfer in addition to making insurance payments on the property. Also, debtors paid no rent. Under these facts, continuing concealment was found even though the transfer had occurred approximately seven years prior to the filing of debtor's bankruptcy. In *In re: Hodge,* 92 B.R. 919 (Bkrtcy.D.Kan.1988) the court found continuing concealment on the part of a debtor who, in order to avoid execution of judgments, formed numerous corporate entities wholly owned by his non-debtor wife. The debtor in *Hodge,* subsequent to the formation of these corporations, transferred the assets of his partnership into the corporations owned by his wife. The court had little difficulty in finding this to be a concealment. The court found that debtor continued to exercise a significant level of control over his wife's corporations in addition to benefiting from the use of the assets of the newly formed corporations. Based on the totality of the evidence, the court found a continuing concealment. In the most recent case espousing the continu-

ing concealment doctrine, the court in *In re: Essres,* 122 B.R. 422 (Bkrtcy.D.Colo. 1990) found a continuing concealment where debtors had transferred numerous items of personal property to their children yet continued to maintain the majority of the personal property in their possession, sell and deposit funds from the sale of the transferred property in their personal account and continued to take deductions for expenses related to the transferred property on their income tax statements. The court found that debtors did not treat the property any differently than they did prior to the date of the alleged transfer hence the court held that debtors had maintained a significant beneficial interest in the property sufficient to satisfy the one year limitations in § 727(a)(2)(A). Other cases supporting the continuing concealment doctrine include *In re: Penner,* 107 B.R. 171 (Bkrtcy.N.D.Ind.1989); *In re: Peters,* 106 B.R. 1 (Bkrtcy.D.Mass.1989); and *In re: Syrtveit,* 105 B.R. 596 (Bkrtcy.D.Mont. 1989).

■ Applying the rationale of these numerous court decisions to the facts of this case leave this Court with the conviction that Debtor's actions subsequent to the alleged transfer of the Florida property constitute a continuing concealment as developed by case law. Debtor purchased the Florida property on June 15, 1983. He was living in it when the property was transferred to Caroline Cook on August 23, 1985. Following the transfer Debtor continued to live in the property until its sale in December 1987. At no time did Caroline Cook ever live in the home. From the time the home was purchased by Debtor in 1983 until its sale, Debtor continued to make all mortgage payments on the property. At no time did Debtor ever pay any consideration to Caroline Cook for the use of this property. The sale was consummated through a written power of attorney granted to Debtor by Caroline Cook and following the sale Debtor maintained possession of the approximately $57,000.00 in proceeds of the sale. It is not disputed that Caroline Cook at no time ever was in possession or control of the proceeds of the sale of the

Florida property. The testimony reveals that Debtor and Caroline Cook had a loose understanding that Debtor was to have unbridled control of the proceeds of the sale of the Florida property for use as living expenses subject to the setting aside of enough funds to meet any income tax obligations accruing to Caroline Cook as a result of the sale. At no time did Caroline Cook ever list the sale on her income tax statements.

Following the sale of the Florida property, Debtor moved to the Henderson County, Texas, property which he had given to his daughter in a 1984 transaction. As in the case of the Florida property, the Henderson County property was a gratuitous gift from Debtor to Caroline Cook with no consideration being given by Caroline Cook. It is not disputed by the parties that Debtor maintained a recurring presence at the Henderson County property subsequent to the December 1987 sale of the Florida property. Caroline Cook's visits to the Henderson County property were infrequent and her knowledge of the contents on the Henderson County property was limited. The Court notes that Caroline Cook 1) kept very little in the way of personal effects at the Henderson County property; 2) required the assistance of her father to compile a list of items allegedly taken from the Henderson County property by the Hubbell representatives after their visit to the property; and 3) charged her father no rent for the use of the property.

Finally, relating to the issue of the ownership of the proceeds from the sale of the Florida property the Court notes somewhat incredulously that while Debtor maintains that the proceeds of the sale of the Florida property are in fact Caroline Cook's the proceeds were kept in a locked portable safe in the Henderson County property and that Debtor held the only key to the safe containing the proceeds. In fact, this Court can find no evidence at all demonstrating that Caroline Cook had any control whatsoever over the proceeds of the sale of

the Florida property and it appears equally clear to this Court that Debtor maintained absolute beneficial control over the proceeds at his sole discretion.[3] Thus, this Court has no difficulty in finding that Debtor's actions subsequent to the sale of the Florida property act as a continuing concealment within the guise of § 727(a)(2)(A). Also, while it was not emphasized by Hubbell, it appears almost as clear that the transfer of the Henderson County property also fits quite comfortably within the continuing concealment doctrine. With this holding, the Court is of the opinion that Hubbell has demonstrated that the Debtor has concealed property of the Debtor subsequent to one year before the date of the filing of the petition. With this finding, the Court will now address the final issue of intent.

■ Not surprisingly, a debtor is rarely likely to testify as to his malevolent intent as to any given transaction. As recognized by the court in *In re: Essres*, 122 B.R. 422, 426 (Bkrtcy.D.Colo.1990) "the debtor's intent is rarely susceptible to direct proof." Accordingly, "fraudulent intent may be established by circumstantial evidence or by inferences drawn from a course of conduct." *Id.* at 426. In the development of case law, certain facts and circumstances act as "badges of fraud" as further evidence of the requisite intent. *In re: Peters*, 106 B.R. 1, 4 (Bkrtcy.D.Mass.1989). The court in *Peters* lists several factors that had been identified in the past as "badges of fraud":

1. lack or inadequacy of consideration;
2. the family, friendship or close associate relationship between the parties;
3. the retention of possession, benefit or use of the property in question, although title exists in another entity;
4. the financial condition of the party sought to be charged both before and after the transaction in question;
5. conveyance of all of the debtor's property;

---

**3.** Debtor argued at trial that he kept a running ledger documenting his use of the proceeds for the express purpose of repaying Caroline Cook but that the ledger was stolen by the Hubbell representatives during their visit to the property. This factor does not alter the Court's conclusion that the funds were subject to Debtor's absolute control.

6. secrecy of the conveyance;

7. existence of a trust or trust relationship between the debtor and the person to whom the property was conveyed;

8. the existence or cumulative effect of a pattern or series of transactions or a course of conduct after the incurring debt, onset of financial difficulties, or pendency or threat of suit by creditors;

9. the instrument affecting the transfer suspiciously states it is in fact bona fide;

10. the debtor makes a voluntary gift to a family member;

11. the general chronology of events and transactions under inquiry.

*See* also *In re: Penner,* 107 B.R. 171, 175–176 (Bkrtcy.N.D.Ind.1989); *In re: Essres,* 122 B.R. 422, 426–427 (Bkrtcy.D.Colo.1990).

Individually, just one of these factors can maintain a finding of fraudulent intent. *In re: Penner,* 107 B.R. 171, 176. However, as is noted by the *Penner* court, "the accumulation of several factors can lead inescapably to the conclusion that the debtor possessed a requisite intent." *Id.* at 176. In applying the facts of the instant case to the "badges of fraud" previously listed, this Court can come to no other conclusion than that Debtor's actions evidence fraudulent intent pursuant to § 727(a)(2)(A). First, this Court finds that the transfer of the Florida property was tainted by a lack of consideration as to both of the parties. Simply put, Caroline Cook paid nothing for the Florida property nor did she receive any arguable benefit from its ownership. The testimony is clear that she never lived in the home nor did she receive any rents through Debtor's use of the property. In fact, even after the Florida property was sold Caroline Cook not only did not receive control of any of the proceeds from the sale but apparently incurred a detrimental tax liability to boot. Second, the Court notes that this transfer was between a father and his daughter under circumstances that do not suggest an arms length

transaction that would belie any suspicion. Third, Debtor retained possession, benefit and use of the Florida property even though title, subsequent to the transfer, existed nominally in the name of Caroline Cook. Fourth and fifth, the Court is disturbed by the general chronology of events and transactions under inquiry as well as the existence and cumulative effect of the series of transactions and course of conduct of the Debtor after incurring the debt, experiencing financial difficulties and being subject to pending litigation by creditors. Debtor explained the gratuitous transfers to his daughter as manifestations of his desire to share his good financial fortunes with her. The Court finds that Debtor's fortunes were far from good at that time. Disputes began to arise between Hubbell and Debtor as early as 1983 relating to charges by Hubbell that it had paid Debtor consideration for the issuance of insurance policies which were never issued. Within this period of time, it appears to this Court that (1) Debtors financial status at this time can best be charitably described as unsettled; (2) Debtor gratuitously gifted the Henderson County property to Caroline Cook; (3) The bounds of his generosity were further exceeded when the Florida property was transferred to Caroline Cook in August 1985; and (4) Debtor's disputes with all of the underlying parties to the Hubbell transaction had evolved into actual litigation. To say the least, the Court finds the timing of Debtor's generosity, in the face of serious litigation, to be somewhat troubling. Sixth, this Court is troubled by the fact that Debtor's transfer of the Florida property to Caroline Cook was entirely voluntary.

In conclusion, the finding by this Court that the fraudulent intent requirement of § 727(a)(2)(A) has been met together with the earlier findings of this Court supports a finding that Hubbell has carried its burden of proof and hence this Court will deny Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(A).[4] Furthermore,

---

**4.** It is not necessary for the determination of this 11 U.S.C. § 727(a)(2)(A) cause of action whether Hubbell misappropriated partly or

wholly the approximately $33,000 in proceeds from the sale of the Florida property at or near the time of Hubbell's occupation of the

this Court's findings pursuant to 11 U.S.C. § 727(a)(2)(A) renders Hubbell's § 727(a)(3), § 727(a)(4) and § 523(a)(4) causes of action superfluous accordingly, this Court dismisses said causes of action as moot. And furthermore, the Court hereby remands the state law causes of action for conversion and wrongful debt collection alleged by Plaintiff, Caroline Cook, in adversary proceeding number A–90–6018 i.e. removed state court proceeding 89–9655, back to the 14th Judicial District Court of Dallas County, Texas, with the express finding that the $33,000 in proceeds from the sale of the Florida property were at all relevant times property of the Debtor, Michael Gay Cook.

IT IS SO ORDERED.

Henderson County, Texas, property. What is necessary to the Court's decision is a determination that the Florida property proceeds existed during the relevant § 727(a)(2)(A) time frame. The Court finds that it must rely on Debtor's testimony to establish this fact since the Debtor is the only party with personal knowledge of the existence of the proceeds. Debtor's testimony is clear and unconflicting that proceeds from the sale of the Florida property were in existence in December 1987. Debtor further corroborated in a deposition that as of July 1988 approximately $33,000 of the proceeds remained. Finally, Debtor's testimony throughout this hearing alleged that Hubbell representatives misappropriated $33,000 of the proceeds during their occupation of the Henderson County, Texas, property on September 20, 1988, thereby once again corroborating the existence of these proceeds. Debtor's unrebutted representations alone are sufficient to establish the existence of the Florida property proceeds within one year of filing and the Court so finds. Finally, Hubbell's complaint requires only a demonstration that the elements for 11 U.S.C. § 727(a)(2)(A) are met; the fact that these proceeds did not exist on or around September 20, 1988, is not germane in this pursuit. The Court finds that Hubbell has met its burden. Had Hubbell not met its burden, Hubbell's difficulties in state court with Caroline Cook would have undoubtedly been compounded but that is irrelevant to the Court's decision today. In that Debtor's discharge in bankruptcy is denied, the parties are free to pursue in alternate forums the legality of the action's occurring on or about September 20, 1988, at their leisure.