**In re Larry Jay COHEN, Debtor.**

**The BANK OF CHESTER COUNTY, Plaintiff,**

v.

**Larry Jay COHEN, Defendant.**

**Bankruptcy No. 91–14643S.**
**Adv. No. 91–1109.**

United States Bankruptcy Court,
E.D. Pennsylvania.

July 23, 1992.

Eric L. Frank, Miller & Miller, Philadelphia, Pa., for debtor.

Guy A. Donatelli, Lamb, Windle & McErlane, P.C., West Chester, Pa., for plaintiff.

Lawrence T. Phelan, Philadelphia, Pa., trustee.

Michael J. McCanney, Jr., Plymouth Meeting, Pa., for Philip J. Banks.

Susan Verbonitz, Philadelphia, Pa., for Royal Bank of Pa.

David Fishbone, Ciardi, Fishbone & DiDonato, Philadelphia, Pa., for Joseph and Tremayne Selig.

Frederic Baker, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding exemplifies the difficulties inherent in a creditor's reliance, as its sole basis for challenging a debtor's bankruptcy discharge, upon 11 U.S.C. § 727(a)(2)(A), which requires an "intent to hinder, delay, or defraud a creditor," as opposed to 11 U.S.C. §§ 727(a)(3) and (a)(5), which do not necessitate any showings of the debtor's motivations for actions. Unfortunately for THE BANK OF CHESTER COUNTY ("the Plaintiff"), by initially pleading a dischargeability count under 11 U.S.C. § 523(a)(2)(A), as recounted in *In re Cohen*, 139 B.R. 327 (Bankr.E.D.Pa.1992) (*"Cohen I"*), where we allowed the plaintiff to amend its Complaint, it was compelled to rely exclusively on § 727(a)(2)(A) as a basis for relief here.

We are thus compelled to deny the relief sought by the Plaintiff—the denial of the discharge of LARRY JAY COHEN ("the Debtor")—because the Plaintiff has not shown by a preponderance of the evidence that the Debtor possessed the requisite intent to hinder, delay, or defraud his creditors. Instead, we find that the Debtor did not retain a beneficial interest in his assets and was inspired to convey them to his niece and nephew for, principally, personal reasons unrelated to circumvention of creditors, who were not in fact greatly hampered by the transfer in any event. We also find that the Plaintiff has not shown that the Debtor received any post-transfer benefit from the transferred assets which would support a finding of "continued concealment" of the transfer, as was neces-

sary to satisfy the one-year transfer limitation period set forth in § 727(a)(2)(A).

## B. PROCEDURAL HISTORY

The procedural and factual histories of this proceeding, through May 1, 1992, are set forth in *Cohen I,* 139 B.R. at 328–31, and will not be repeated here. Suffice it to say that the Plaintiff expressly stated, in the course of its belated efforts to amend its Complaint, that it relied exclusively upon § 727(a)(2)(A) as the basis for its claim in this proceeding, *id.* at 330, and that counsel's "candor and consistency" in commitment to such a difficult basis for challenging the Debtor's discharge was a factor in our allowing the requested amendment to the complaint in *Cohen I. Id.* at 335. The Plaintiff was, therefore, required to live with, and ultimately die with, the consequences of this choice.

On May 7, 1992, the Plaintiff filed the Transcript and Amended Complaint which we had required it to produce as a condition for allowance of the requested amendment in *Cohen I. Id.* at 335–36. The supplemental trial in *Cohen I* took place on June 11, 1992, as scheduled.

The sole witnesses at the relatively brief supplemental trial (lasting about one and a half (1½) hours) were the Debtor (principally) and Gael O'Reilly, an independent "loan consultant" hired by the Plaintiff who worked on the loans to the Cohen entities. Also added to the record was a deposition of Dr. William H. Lipshutz, the Debtor's personal physician. The following Findings of Fact are cumulated from the initial trial of March 17, 1992, and the supplemental trial of June 11, 1992.

## C. FINDINGS OF FACT

1. The Debtor, 28 years old as of March 17, 1992, graduated from the University of Pennsylvania in 1985, and shortly thereafter began trading equity options on the volatile Philadelphia Stock Exchange. He testified that he did very well in this profession, earning, for example, about $1 million on "Black Monday," October 19, 1987, alone.

2. In 1988, the stock exchange became less lucrative, and the Debtor became involved in the real estate empire accumulated by his older brother, Brad Cohen ("Brad"). Through 1989, the Debtor gave increasingly less attention to the stock exchange and more attention to management of about 30–35 parcels of real estate owned by partnerships and other entities which included, *inter alia,* Brad and him as partners or principals.

3. In December, 1989, Brad purchased Kid's Point of View, Inc. ("KPOV"), a children's clothing chain of about 19 stores. Thereafter, the Debtor's primary duty was management of KPOV.

4. Between November, 1989, and July, 1990, the Plaintiff made a series of five loans, totalling approximately $1.6 million, to certain realty partnerships of which the Debtor and Brad were, among others, partners, and in which transactions the Debtor was a guarantor. In all of these transactions, Brad was also a guarantor and Brad was the party who conducted all of the loan negotiations. Brad was then quite well known and highly regarded as a young "real estate magnate" in the Philadelphia area. *See In re Cohen,* 1992 WL 77758, slip op. at *1 (Bankr.E.D.Pa. April 19, 1992).[1]

5. Other partners and principals in the partnerships and other entities accumulated by Brad were Lilia Cohen ("Lilia"), Brad's wife, and several other non-Cohen individuals, who were co-guarantors on some of these loans.

6. While the Plaintiff has been partially repaid, apparently as a result of obtaining confessed judgments against the entities owning the properties and, in some cases, executing upon the properties securing the loans, there is still outstanding on these obligations, in excess of one million ($1,000,000.00) dollars in principal and one hundred fifty thousand ($150,000.00) dollars in interest.

---

**1.** This is the proceeding unsuccessfully challenging the Debtor's dischargeability under 11 U.S.C. § 523(a)(2)(B) initiated by Royal Bank of Pennsylvania which is discussed in *Cohen I,* 139 B.R. at 328–29 n. 1. We will refer to it hereafter as *"the Royal Case."*

7. At the time that the loans were made, the Debtor provided the Plaintiff with a financial statement dated July 30, 1989, which listed his net worth as being in excess of eleven million, two hundred thousand ($11,200,000.00) dollars. The Debtor's main assets were interests in real estate partnerships and closely-held corporations which had a combined value of thirteen million, seven hundred and fifty thousand ($13,750,000.00) dollars. An updated financial statement, dated March 31, 1990, listed the Debtor's net worth at approximately nineteen million, nine hundred thousand ($19,900.000.00) dollars, of which over nineteen million, five hundred thousand ($19,-500,000.00) dollars, almost all of which was referenced as his interests in real estate investments and closely-held corporations.

8. In February, 1990, Brad was indicted for certain crimes, and he was ultimately convicted of wire fraud. The Debtor testified that, as a result of his personal distress, Brad did not focus on his work and many business deals came to a halt. Throughout 1990, the Debtor's personal and business relationship with Brad deteriorated. The Debtor testified that Brad began abusing alcohol, which rendered him uncooperative and resulted in verbal and physical fights between the two brothers. The Debtor therefore found it impossible to continue to work with his brother and gave up his relationship with Brad's business entities.

9. At this point, the work responsibilities of the brothers were apportioned by each bother doing an exclusive job. Brad conducted business with the banks. The Debtor ran KPOV. David Haas was hired to manage the properties.

10. On August 15, 1990, when this work breakdown failed to resolve his difficulties in working with Brad, the Debtor entered into a written agreement with Brad and Lilia whereby he "acknowledged" that he transferred his interests in all of his real estate investments and interests in a number of partnerships and closely-held corporations, including KPOV, to Brad and Lilia in trust for their young minor children, Eric Cohen and Stephanie Cohen. As consideration for the transfer, the Debtor received a promise of indemnification for liabilities arising out of the partnerships and their transactions from Brad.

11. The Plaintiff commenced collection efforts against Brad in August, 1990. However, despite its efforts to collect on prior loans which had become delinquent, the Plaintiff nevertheless made an additional loan to Brad to help pay his criminal defense bills on August 20, 1990. This was secured by mortgages from Central Square Associates and Nini Associates, borrower-partnerships of the Debtor and Brad. The mortgage documents were executed by the Debtor.

12. The Debtor claimed that he informed Robert R. Galbusera, Jr., former Chief Executive Officer of the Plaintiff, and O'Reilly of his intention to get out of Brad's businesses, although he admitted that he never gave them a copy of the aforesaid transfer agreement of August 15, 1990. These allegations of their oral advice of the transfer were denied by Galbusera and O'Reilly, who stated that most of their contacts regarding the loans were with Brad and that the issue of the transfer was not raised by the Debtor in their limited contacts with him.

13. We find that the Plaintiff did not provide specific notice of the August 15, 1990, transfer, to Galbusera, O'Reilly, or any other agent or employee of the Plaintiff, and that his only communications with Galbusera and O'Reilly in this regard were vague references of a desire to get out of his relationship with Brad.

14. However, there is no evidence that the Bank planned or threatened any legal actions against the Debtor at any time prior to August 15, 1990, or at any time immediately thereafter, or that it was hampered in its later collection efforts, which apparently included entries of confessed judgments against the borrower-entities and execution sales of certain of their properties. *See* Findings of Fact 6, page 723 *supra.*

15. On October 26, 1990, the Debtor signed a long overdue collateral mortgage in favor of the Plaintiff as a partner of Tulpehocken Associates, one of the five borrower-entities. Apparently, this trans-

action was handled by Brad, and the mortgage was delivered by him to the Plaintiff.

16. The Plaintiff also presented a letter of September 17, 1990, which the Debtor wrote to a clothing supplier, signed by himself as president of KPOV.

17. The Debtor testified that he signed the post-August 15, 1990, mortgages as an accommodation to the Plaintiff and that he wrote the KPOV letter to help a woman friend working for the supplier. The Debtor indicated that he received no income from, and performed no services for, any Cohen-related entities after August 15, 1990.

18. Particularly at the June 11, 1990, supplemental trial, the Debtor emphasized the fact that he suffered from gastrointestinal problems which were exacerbated with the stress arising from his relationship with Brad at the time of transfer. He claimed that a diagnosis by Dr. Lipshutz, on July 19, 1990, that he was suffering from Crohn's Disease was a significant factor in his decision to effect the August 15, 1990, transfer. Dr. Lipshutz supported the diagnosis of Crohn's Disease, although he did not support the Debtor's allegations of the severity of the disease at that time. The Debtor also indicated that he was seeking psychiatric help at this time.

19. Most, if not all, of the properties owned by the partnerships and corporations formed by Brad have been lost at foreclosure sales or are presently the subject of bankruptcy cases which have been unsuccessful. The value of this property has decreased dramatically since 1989 and early 1990, and the total equity therein is probably worthless. None of these entities or any of the other Cohen entities, including KPOV, were proven to have any value at present.

20. The transfer of the Debtor's property interests to his niece and nephew was motivated mostly by a desire of the Debtor to escape the dramatic downward spiral of the fortunes of Brad's entities, contributed to by the Debtor's own physical and mental health problems. There is no evidence that this transfer was intended to hinder, delay, or defraud the Plaintiff's collection efforts, or that it could have, or actually did, hinder or delay such efforts.

21. The Debtor neither sought nor actually received any benefit from his interests in the entities transferred after August 15, 1990.

## D. DISCUSSION

### 1. THE PLAINTIFF'S BURDENS UNDER § 727(a)(2)(A).

The determinative matter at issue is whether the Plaintiff has met its burdens, expressly placed upon it by Federal Rule of Bankruptcy Procedure 4005, of proving the elements of 11 U.S.C. 727(a)(2)(A), which provides as follows:

(a) The court shall grant the debtor a discharge, unless—

.      .      .      .      .

(2) the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor within one year before the date of the filing of the petition; ...

To persuade this court that the Debtor should not be granted a discharge under § 727(a)(2)(A), the Plaintiff was obliged to prove that (1) the Debtor transferred, removed, etc., property; (2) the property belonged to the Debtor; (3) the transfer, removal, etc., occurred within one year of the filing of the Debtor's bankruptcy petition; and (4) the Debtor intended to hinder, delay, defraud a creditor. *In re Henderson*, 134 B.R. 147, 156 (Bankr. E.D.Pa.1991). *Accord, e.g., In re Cook*, 126 B.R. 261, 266 (Bankr.E.D.Tex.1991); *In re Davis*, 124 B.R. 831, 824 (Bankr.D.Kan. 1991); *In re Garcia*, 88 B.R. 695, 702 (Bankr.E.D.Pa.1988); *In re Goldstein*, 66 B.R. 909, 917 (Bankr.W.D.Pa.1986); *In re Wolmer*, 57 B.R. 128, 131 (Bankr.N.D.Ill. 1986); and *In re Hooper*, 39 B.R. 324, 326 (Bankr.N.D. Ohio 1984). As stated in *Henderson, supra*, the courts have consist-

ently construed objections to discharge strictly against the objector and in favor of the debtor. 134 B.R. at 156. *See also Goldstein, supra,* 66 B.R. at 917. This is because § 727 is "the very breath of the 'fresh start' created by the Bankruptcy Code". *Id.* This breath can be snuffed out only by proof of conduct expressly prohibited by the Code.

The facts support two of the four elements to be proved for denial of discharge. It is undisputed that the Debtor transferred an interest in property that belonged to him to Brad's children. There is clearly an issue as to whether the actual transfer took place over one year before the Debtor declared bankruptcy. Since the transfer occurred on August 15, 1990, and the Debtor filed his bankruptcy case on August 30, 1991, the transfer appears to be outside of the scope of § 727(a)(2)(A). However, the Plaintiff contends that the Debtor engaged in a "continuing concealment" of the transfer, bringing the transfer within the one year period. Also at issue is whether the Debtor, in making the transfer, possessed the requisite intent to "hinder, delay or defraud" his creditors.

■ Although the Plaintiff clearly has the burden of proving all of the facts essential to the objection to the Debtor's discharge, *Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), appears to establish that the standard of such proof is the "preponderance of the evidence" standard, as opposed to the harsher "clear and convincing evidence" standard. *Henderson, supra,* 134 B.R. at 156. *Accord, e.g., In re Serafini,* 938 F.2d 1156, 1157 (10th Cir.1991); *In re Sumpter,* 136 B.R. 690, 693–95 (Bankr.E.D.Mich.1991); *Cook, supra,* 126 B.R. at 265–66; and *In re Goldstein,* 123 B.R. 514, 522 n. 15 (Bankr. E.D.Pa.1991). *See also In re Somerville,* 73 B.R. 826, 834 (Bankr.E.D.Pa.1987) (proof of intent to hinder or delay creditors held had to be proven, even prior to *Grogan,* only by "preponderance of the evidence").

2. CONTINUING CONCEALMENT OF THE TRANSFER BY THE DEBTOR WAS NOT PROVEN.

■ Although the Debtor's transfer of assets occurred more than one year before bankruptcy, it may nevertheless serve as a ground for an objection to discharge if the Plaintiff establishes that there was a "continuing concealment" of the transfer within the one-year period. *See In re Olivier,* 819 F.2d 550, 554 (5th Cir.1987) (discharge denied although transfer occurred over seven years prior to bankruptcy because of secretly retained interest in property); *In re Kauffman,* 675 F.2d 127, 128 (7th Cir.1981) (discharge denied although transfer occurred over a year prior to bankruptcy because the transfer, though recorded, was found to be a "continuing concealment" made to avoid a judgment); *In re Essres,* 139 B.R. 958, 961–62 (D.Colo.1992) (debtors continued to treat the property allegedly transferred to their children as their own); *Cook, supra,* 126 B.R. at 266 (discharge denied although transfer occurred over three years prior to bankruptcy because debtor maintained beneficial control over property); and *Hooper, supra,* 39 B.R. at 324 (continuing concealment is sufficient to bring the transfer within the statutory period).

■ Two common characteristics of cases which involve successful "continuing concealment" claims are (1) the transfer of property by a debtor who still retains a beneficial or equitable interest in the property; and (2) the debtor's continuing to treat the property in the same manner after the transfer as before the transfer. *Henderson, supra,* 134 B.R. at 157. *Accord Olivier, supra,* 819 F.2d at 555; *Kauffman, supra,* 675 F.2d at 128; *Cook, supra,* 126 B.R. at 268; *In re Penner,* 107 B.R. 171, 174 (Bankr.N.D.Ind.1989); and *In re Hodge,* 92 B.R. 919, 922 (Bankr.D.Kan. 1988).

■ The Plaintiff charges that the Debtor concealed the transfer by continuing to present himself as a partner or principal of certain of Cohen-related business, thereby retaining an interest in the property, after the transfer and within one year of the bankruptcy filing. However, the only evidence in support of this allegation is the Debtor's signing of the Tulpehocken Associates' mortgage as collateral for a past loan in October, 1990; his execution of two

mortgages as collateral for a modest loan of Brad on August 20, 1990; and his signature as president of KPOV on a letter in September, 1990. These scraps of evidence, though undisputed, do not, in themselves, come close to meeting the burden upon the Plaintiff, *i.e.*, to prove that the Debtor retained a beneficial interest in the Cohen entities when he signed the agreement of August 15, 1990, such as would bring the transfer within the statutory period. *See In re Hooper, supra*, 39 B.R. at 327. The concealment of property necessary to warrant a denial of discharge constitutes more than the mere hiding or non-disclosure of assets. *Penner, supra*, 107 B.R. at 174. It encompasses the inclusion of "a transfer of title coupled with the retention of the benefits of ownership." *Id.*, quoting *Olivier, supra*, 819 F.2d at 553. *See also Kauffman, supra*, 675 F.2d at 128. The Debtor concedes that he did, in these instances, represent himself as a partner of the real-estate partnerships and president of KPOV. However, his continued receipt of benefits from doing so is not supported by the evidence.

Examples of a retention of a beneficial interest which have warranted a denial of discharge include (1) working and managing a dairy after the Debtor's transfer of it to his wife and his receiving nominal "salary" and compensation for personal expenses. *Penner, supra*, 107 B.R. at 175; and (2) managing a corporation and deriving substantial benefit from assets of corporation after a transfer by the debtor to his wife by reaping benefit from the wife's interest. *Hodge, supra*, 92 B.R. at 922. In contrast, retaining an interest in the property, such as remaining to live in a house after its conveyance, may not be deemed sufficient to deny discharge. *Hooper, supra*, 39 B.R. at 327 (bare proof that debtors continued to live in transferred property is not continuing concealment). *Compare Cook, supra*, 126 B.R. at 267 (debtor lived and paid mortgage on a house transferred to daughter, *and* retained full control of proceeds from its subsequent sale; discharge denied).

Although it appears that the Debtor may, in a nominal sense, have represented himself as a partner and officer of respec-

tive Cohen entities by signing certain documents, the Plaintiff has not shown, by a preponderance of evidence, that this nominal interest constituted a real, beneficial interest in the said entities. On their face, the facts at hand bear superficial similarity to the *Hodge* facts, where the debtor was denied discharge because he continued to manage a corporation which he had transferred to his wife. 92 B.R. at 922. However, in *Hodge*, the husband retained a beneficial interest by sharing the benefits of his wife's interest. *Id.* The evidence in the present case does not indicate that the Debtor received a portion of the benefits from any of the Cohen entities at any time after August 15, 1990. It appears that the entire beneficial interest in this property, such as it was, reverted to Brad and his nominees. There is no evidence that either the debtor supported himself from these entities, or that Brad supported or maintained the Debtor from these entities or otherwise at any time, before or after August 15, 1990.

Other indicia of retention of a beneficial interest are exemplified by *Kauffman, supra*, where the debtor took out personal loans using the house which he had transferred as collateral, lived in it, and continued to make mortgage, tax and insurance escrow payments. *Kauffman, supra*, 675 F.2d at 128. In addition, the property was listed by the debtor as one of his assets on his personal financial statements. *Id.* Although the instant Debtor presented himself, in one instance, as president of KPOV and signed isolated mortgage documents as a general partner of properties transferred, this evidence does not support the conclusion that he utilized his transferred assets to his personal advantage, as did the debtor in *Kauffman*. The proceeds of the August 20, 1990, mortgage went to Brad. The proceeds of the Tulpehocken mortgage loan had apparently gone to that entity itself long prior to October 26, 1990. There is no evidence that the Debtor was receiving any benefits from KPOV as of September 17, 1990. Without evidence that the Debtor retained an interest or control over the property (and all of the evidence points to continuing control by Brad), and/or that

the Debtor received some benefits from the properties after the transfers (which has not been proven), the transfers must be considered absolute. *See Hooper, supra,* 39 B.R. at 327.

We conclude that the "continuing concealment" doctrine does not apply here. Therefore, the transfers are beyond the one-year period set forth in § 727(a)(2)(A) and may not, for that reason, be a basis for denial of the Debtor's discharge.

### 3. INTENT OF THE DEBTOR TO HINDER, DELAY, OR DEFRAUD CREDITORS WAS NOT PROVEN.

■ However, an even more significant ground for denying relief to the Plaintiff arises from consideration of the issue of proof of the Debtor's intention to hinder, delay or defraud creditors in making the transfer in issue. It is essential to a cause of action under § 727(a)(2)(A) to prove, by a preponderance of the evidence, *actual* intent to hinder, delay or defraud a creditor in making a transfer. *Henderson, supra,* 134 B.R. at 157. As this Court has found in the earlier cases of *In re Trinsey,* 114 B.R. 86, 90 (Bankr.E.D.Pa.1990); and *Somerville, supra,* 73 B.R. at 834, proof of an intention to hinder, delay, or defraud creditors, and/or knowing and fraudulent behavior under §§ 727(a)(2) and (a)(4), is much, much more difficult to prove than the elements of the grounds set forth in §§ 727(a)(3) and (a)(5), which include no comparable "subjective" elements. *Compare Meridian Bank v. Alten,* 958 F.2d 1226, 1234 (3d Cir.1992); and *Goldstein, supra,* 123 B.R. at 522, 525. We recognize that actual intent will rarely be proven by direct evidence, nor need it be. *See Penner, supra,* 107 B.R. at 175. However, it is not enough to prove "constructive intent." *Henderson, supra,* 134 B.R. at 157.

■ The relevant case law has developed a series of factors, often called "badges of fraud," which are indicia that actual intent exists. *Penner, supra,* 107 B.R. at 175. "Badges of fraud" are factors established by circumstantial evidence which help determine whether an actor possessed actual intent. *Id.* The court in *Cook, supra,* adopted the following list of

badges of fraud set forth in *In re Peters,* 106 B.R. 1, 4 (Bankr.D.Mass.1989):

(1) lack of inadequacy or consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question, although title exists in another entity;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) conveyance of all of the debtor's property;

(6) secrecy of the conveyance;

(7) existence of a trust or trust relationship between the debtor and the person to whom the property was conveyed;

(8) the existence or cumulative effect of a pattern of series of transactions or a course of conduct after the incurring debt, onset of financial difficulties, or pendency or threat of suit by creditors;

(9) the instrument affecting the transfer suspiciously states it is in fact bona fide;

(10) the debtor makes a voluntary gift to a family member; and

(11) the general chronology of events and transactions under inquiry.

*Accord, In re Wojtala,* 113 B.R. 332, 336 (Bankr.E.D.Mich.1990). *Cf. In re Pinto Trucking Service, Inc.,* 93 B.R. 379, 386 (Bankr.E.D.Pa.1988) (citing a similar list of "badges of fraud" developed under § 4(b) of the Uniform Fraudulent Transfers Act for determination of actual fraud in cases challenging alleged fraudulent conveyances).

■ The general facts surrounding a case are key instruments used to gauge intent because an individual's intent is difficult to prove. It is possible that a very strong finding upon just one factor can establish intent. *Cook, supra,* 126 B.R. at 261. *Accord Penner, supra,* 107 B.R. at 176. "[T]he accumulation of several factors can lead inescapably to the conclusion that the debtor possessed a requisite intent." *Cook, supra,* 126 B.R. at 261,

quoting *Penner, supra,* 107 B.R. at 176. However, the absence of several very significant "badges" may disprove improper intent.

The Debtor himself admits that several badges of fraud are present in this case. There is no dispute that there is a family relationship between the Debtor and the transferees; that the Debtor conveyed all of his property; or that the gift was voluntary. Although the Debtor denies secrecy of the conveyance, the court finds that the Plaintiff was not on notice of the transfer.

On the other hand, we have found that some of the badges of fraud do not exist. There was no use of the property after the transfer, *see* pages 727–28 supra; the chronology does not establish the pendency or threat of suit by creditors or add to the likelihood of an improper motivation for the transfer; and the instrument of transfer, such as it is, contains no suspicious language.

"Badges" which we consider very significant are the "adequacy of consideration" and the effect of the transfer on the transferor's financial condition. The Plaintiff attempts to make much of the fact that the Debtor received nothing except a promise of indemnification from Brad in exchange for a transfer of interests in property previously valued in the millions. There is some evidence that Brad hired counsel to defend the Debtor in a few instances. However, the bankruptcy filing itself is perhaps the best indication of the inadequacy of Brad's promise of indemnification as any sort of real economic protection to the Debtor in the future.

However, there is a real doubt in our mind as to whether the Debtor gave up anything of real value or adversely affected his financial status by making the transfer. As far as we know, none of the Cohen entities have been proven to be crown jewels laden with equity. Some of the properties in issue in the loans from the Plaintiff were the subject of foreclosure and execution sale, and now the deficiencies remaining are the substance of the Plaintiff's claims. Perhaps the promise of indemnification of liability was worth *something.* The Cohen entities, at this point, appear *worthless* without capital infusions that Brad has been unable to administer and no others have been willing to risk. We therefore find that the consideration given for the transfer was in exchange for a transfer of nothing of value, and hence was not inadequate.

Weighing the effect of the transfers upon the Debtor's financial condition also requires us to take a broad perspective of the instant factual setting. The greatest difficulty which we have with the Plaintiff's proof of the Debtor's improper intentions in making the transfers is the absence of evidence that the Plaintiff actually was hindered or delayed in collection of the Debtor's obligations to it by the Debtor's actions, or that the Debtor foresaw and hence intended that any hinderance or delay would transpire as a result of the transfer in issue.

The Plaintiff has sold at least part of the collateral and obtained deficiency judgments against the Debtor-entities and the guarantors some time between late 1990 and the Debtor's bankruptcy filing in August, 1991. There is no evidence that the transfer delayed or hindered this very efficient foreclosure process in any manner whatsoever.

The end result of these collection proceedings are deficiency claims against all of the guarantors. As we noted in *the Royal Case,* slip op. at *3, the lenders to the Cohen entities obviously relied principally upon the financial prominence of Brad in making loans to these entities. There is no evidence that the guarantee of the Debtor was significant at all, or at least any more significant than those of any of the non-Cohen guarantors. *Id.* There is no evidence that the Debtor owned anything of value other than the leveraged properties themselves, which apparently remained equally as accessible to *in rem* foreclosure actions whether the Debtor transferred his interest in them to Brad's children or not.

Furthermore, it seems to us that the transfer of property of August 15, 1990, was not valid or enforceable as to any parties except the immediate parties to the

transaction. This transaction did not transfer record title to the properties. It did not and could not affect the mortgage obligations or guarantees of the Debtor. It therefore had little or no effect whatsoever on the obligations of the Debtor to the Plaintiff or the rights of the Plaintiff against the Debtor. The Plaintiff is prevented from making a recovery against the Debtor not because of this transfer or purported transfer, but because he has filed bankruptcy and has no non-exempt assets.

Therefore, the legal effect of the transfer upon the Debtor's financial condition, vis-a-vis the parties to this proceeding, was a nullity. As such, this transfer could not and did not hinder or delay the Plaintiff's collection efforts. Furthermore, there is no evidence that the Debtor intended it to have any such effect. As we found at Finding of Fact 20, page 725 *supra*, whether for health reasons, or merely because a desire to retain his sanity and some semblance of familial relationship with his brother, the Debtor "wanted out" of Brad's operations vis-a-vis *Brad*. The only end that this transfer could accomplish, i.e., the Debtor's economic separation from Brad, it did accomplish. We find that it neither could, did, nor was intended to accomplish anything more. As such, the transfer in issue is a totally inappropriate vehicle for enhancement of the Plaintiff's rights, or the rights of the other creditors of the Debtor, against the Debtor.

It therefore appears that there is almost an equal number of badges of fraud which do not exist as to the number which do exist, but that the important "badges" militate against the finding of an improperly-motivated transfer. Although not all of the badges of fraud need to be proved to deny the discharge, the "missing" badges go to the heart of the matter of the Debtor's intentions in making the transfer.

We therefore conclude that, even if the Plaintiff had proven that the transfer could be considered as having been made within the one-year period referenced in § 727(a)(2)(A), which it has not, the Plaintiff could not succeed in this proceeding because it has not proven that the Debtor intended to hinder, delay, or defraud creditors in effecting the transfer in issue.

## E.   CONCLUSION

For the foregoing reasons, the Plaintiff's objection to Debtor's discharge will be denied in an accompanying Order.

### ORDER

AND NOW, this 23rd day of July, 1992, upon consideration of the testimony of March 17, 1992, and June 11, 1992; the various other materials of record; and the Briefs of the parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Defendant/Debtor, LARRY JAY COHEN, and against the Plaintiff, THE BANK OF CHESTER COUNTY.

2. It is DECLARED that the Debtor is entitled to receive a discharge from all of his dischargeable debts.