**CENTRAL PRODUCTION CREDIT AS-SOCIATION, Plaintiff–Appellant,**

v.

**Bruce HOPKINS and Jo Anne Hopkins, his wife, d/b/a Fair Play Sales and Auction Company, Defendants–Respondents.**

No. 16620.

Missouri Court of Appeals, Southern District, Division Two.

May 28, 1991.

Harold F. Glass Schroff, Glass & Newberry, P.C., Springfield, for plaintiff-appellant.

Ralph W. Gilchrist, Bolivar, for defendants-respondents.

HOGAN, Judge.

This is an action for damages arising out of the defendants' alleged conversion of plaintiff's security interest in 88 head of cattle. A jury trial resulted in a verdict for the defendants. The plaintiff appealed. Upon review this court found that prejudicial error had been committed in submitting a question of law to the jury. The judgment was reversed and the cause was remanded. *Ozark Production Credit Association v. Hopkins,* 718 S.W.2d 667 (Mo. App.1986). On retrial the defendants again had a verdict and the plaintiff has appealed. We affirm.

Plaintiff Central Production Credit Association, to whom we shall refer as PCA or the plaintiff, financed a continuing farm operation for one Billy Walden. On October 23, 1981 Walden and his wife executed a promissory note payable to PCA in the amount of $346,496.43 and secured the debt by executing a deed of trust and a security agreement. Section 2 of the security agreement describes 851 head of cattle, three farm implements and one brush hog. Paragraph 2.d. of the security agreement provides that after-acquired property, whenever acquired, shall secure the obligation covered by the security agreement.[1]

---

1. "2.d. *Similar and After-Acquired Property.* All additions, accessions, replacements, and substitutions of the Collateral described in this section 2 and any and all property of similar type or kind now owned or hereafter acquired by the Debtor and used for either personal, family or household purposes; farming or ranching operations; or any other business in which the Debtor is or might be engaged, including but not limited to, all offspring of livestock, additions and replacements of crops, livestock and poultry and replacements, substitutions and additions to equipment and other personal property, and all feed, seed, fertilizer, chemicals and supplies to be used in fattening, producing or maintaining the said Collateral. However, no security is granted hereunder with respect to after-acquired consumer goods (other than accessions) given as additional security unless the Debtor acquires rights in them within 10 days after Secured Party gives value." In our view, this language complies with § 400.9–204 prior to its amendment in 1988.

Paragraph 2.e. provides that the debtor's security interest shall attach to all products and proceeds of the collateral described in the security agreement.[2] PCA maintains that a financing statement filed in the county of the debtor's residence—before us as Plaintiff's Exhibit 12—served to perfect its security interest in the cattle and the other collateral described in the security agreement. We accept the plaintiff's premise that the financing statement filed October 22, 1980 was sufficient to perfect its security interest.

Defendants Bruce and Jo Anne Hopkins operated the Fair Play Sales and Auction Company, a livestock sale barn. The record indicates they dealt regularly with Billy Walden, and Bruce Hopkins was aware that PCA had been loaning Walden money to conduct a farming operation. In July 1982 defendant Bruce Hopkins agreed to sell Walden 100 head of cattle to be selected by Walden. The terms of the agreement were that Walden would select or "bid in" 100 head of cattle in lots of varying size and would pay for the cattle when 100 head had been selected. At various times between July 9 and August 10, 1982, 88 head of cattle were "bid in" by Walden at six different sales held at the defendants' auction barn. The sales tickets were made out to Bill Walden but it appears that these tickets were never actually delivered to him. By agreement between Walden and Hopkins, the cattle were held on a farm which belonged to one Morris Bough. Hopkins and Walden agreed that as soon as 100 head of cattle had been accumulated on the Bough farm, Walden "was to write [Hopkins] a check for them and [they would] then [have] been his."

In the fall of 1982, perhaps earlier, the Waldens defaulted in payment of their loan. PCA "picked up and sold" some cattle and defendants Hopkins replevied the 88 head and sold them. Plaintiff there-after commenced this action. Other facts will be noticed in the course of the opinion.

Two assignments of error have been briefed and argued in this court. The first point is subdivided and, slightly paraphrased, is that the trial court erred in refusing to grant its motion for judgment notwithstanding the verdict because: (A) there was no real dispute as to the fact that plaintiff had a valid security interest in the cattle prior to the time Walden acquired possession and rights in the cattle; (B) there was no real dispute as to the fact that the defendants did not retain a written security interest in the cattle when Walden acquired possession and rights in the cattle; and (C) the rights acquired by Walden were sufficient for the plaintiff's lien to attach. An additional assignment of error has been briefed, but in the view we take of this appeal, discussion of that point will not be necessary.

The plaintiff has framed its appeal in terms of the trial court's refusal to grant its motion for judgment notwithstanding the verdict. Our courts have recognized the power and authority of a trial court to direct a verdict for the plaintiff either at the close of the evidence or in response to after-trial motions in situations where there is no real factual dispute and where the facts establish a right to that verdict in the plaintiff. *Alaska Federal Savings & Loan Association v. Hoffman*, 485 S.W.2d 118, 120 (Mo.App.1972). However, as one might expect, some of the dispositive questions presented are questions of law, not questions of fact. We have therefore attempted to review the three principal assignments of error without carefully distinguishing those assignments which present questions of fact from those which present questions of law. The merits of the appeal turn finally upon Walden's right to possession of the cattle or lack thereof.

2. "2.e. *Products and Proceeds.* All products of livestock and/or poultry given as collateral hereunder, including all eggs, milk and wool produced therefrom and all products into which the goods and property described or referred to as Collateral under this section 2 or any part thereof, have been or shall at any time hereafter be manufactured, processed, or assembled; and all cash and non-cash proceeds from the sale, exchange, collection, or other disposition of any of said goods and property, and all accounts and contract rights arising from the sale or other dispositions of any of said goods or property."

## I

The plaintiff's first point is that the trial court erred in failing to sustain its motions for directed verdict and for judgment notwithstanding the verdict because there was no real dispute as to the fact that plaintiff had a valid security interest in the cattle prior to the time Walden acquired possession and rights in the cattle. Taken literally, this point states a non sequitur. This is not a situation in which the security agreement was in effect a purchase money mortgage, and the lender could acquire no rights in the security until its debtor did. The brief is not very carefully written; the "argument" part of the brief is not correlated with the "points relied on," but as we understand the substance of the plaintiff's first point it is that it had perfected a security interest in after-acquired property which necessarily and as a matter of law took priority over any interest the defendants acquired.

The defendants reply by saying that the question whether Walden ever acquired any rights in the 88 head of cattle was a question of fact which the jury could fairly resolve in their favor, and further suggest that the plaintiff's failure to amend its financing statement rendered the financing statement ineffective as to after-acquired property.

▆▆ Considering first the sufficiency of the documents executed by the plaintiff and its debtor to create a security interest in after-acquired property, it is indubitably true that Article 9 of the Uniform Commercial Code permits the creation of such an interest. Section 400.9–204(3) [3] specifically provided, with two exceptions not material here, that a security agreement might pro-

vide that collateral, whenever acquired, would secure all obligations covered by the security agreement. The intent to create a security interest in after-acquired property must be ascertained and judged by the language of the security agreement, not the financing statement. *Polk County Bank v. Graven,* 745 S.W.2d 793, 795 (Mo. App.1988); *Drysdale v. Cornerstone Bank,* 562 S.W.2d 182, 185 (Mo.1978). There is nothing in the Code which expressly states what language is sufficient to create a security interest in after-acquired property, *Polk County Bank v. Graven,* 745 S.W.2d at 795, but in general it may be said that any words which reasonably indicate an intention to create such an interest are sufficient. *Idaho Bank & Trust Co. v. Cargill, Inc.,* 105 Idaho 83, 665 P.2d 1093, 1098 (Idaho App.1983); 8 R. Anderson, *Uniform Commercial Code* § 9–204:8, p. 704, n. 4 (1985). The question whether the parties so intended may sometimes be a question of fact, but ordinarily a writing which satisfies the objective requirements of § 400.9–203(1)(b) is sufficient proof of the parties' intention to create a security interest in after-acquired property. 2 J. White and R. Summers, *Uniform Commercial Code* § 24–3, p. 300 (3d ed. 1988). We believe it may be said as a matter of law that PCA's security agreement created a security interest in the 851 head of cattle described therein and extended that security interest to after-acquired collateral of the same type.

▆▆ The defendants further argue that the plaintiff's financing statement should have been amended because the security agreement was periodically amended to add collateral. Counsel cites § 400.9–402(4), which in part provided that if any amend-

---

**3.** We bear in mind that for many years after it adopted the Uniform Commercial Code, Laws of Mo.1963, p. 503, Missouri retained the 1962 Official Text. The Code was amended from time to time but was not extensively amended until 1988 when the 1972 revised version of the Code was enacted by the 84th General Assembly. Laws of Mo.1988, p. 895. The transitional provisions of the amended statutes, codified as §§ 400.11–103 to 400.11–108, provide in general terms that certain transactions validly entered into before January 1, 1989 (the effective date of the amendments) may be enforced as permitted by any provision of the Code as amended. See F. Koger and S. Reynolds, *Missouri Adopts the Revised Uniform Commercial Code,* 45 J.Mo.Bar p. 27 (1989). Nevertheless, § 400.11–107, RSMo.Cum.Supp.1990, provides that if the positions of the parties were fixed prior to the effective date of the 1988 revision, then questions of priority shall be determined according to the prior law. See 3A U.L.A. § 11–107, p. 444 (1981). The rights of the parties to this action were fixed prior to the 1988 amendments to Chapter 400, and unless otherwise noted, our references are to RSMo 1978.

ment to the financing statement added collateral it was effective as to the added collateral only from the filing date of the amendment. If the language of the 1962 version of § 9–402(4) was somewhat ambiguous, the 1972 Official Comment to § 9–402(4) makes explicit that which was implied in the original code. The reference to an amendment which "adds collateral" refers only to additional *types* of collateral, and a security interest in additional units of a type of collateral already described can be created by the terms of an after-acquired property clause or by execution of a new security agreement. 3A U.L.A., 1972 Official Comment to § 9–402, par. 4, p. 52 (1981). The defendants' argument that the financing statement should have been amended each time the debtors acquired new or additional collateral is, in the circumstances, without merit.

To sum up our conclusions concerning PCA's first assignment of error, we conclude that the language of the security agreement executed October 23, 1981 was sufficient to create an interest in the collateral described and was sufficient to provide that PCA's security interest would attach to after-acquired collateral, at least collateral of the same type originally given as security. The financing statement filed October 22, 1980 complied with the requirements of § 400.9–402 and was filed in the office of the Recorder of Deeds in the county of the debtors' residence as required by § 400.9–401(1)(a). By the express terms of § 400.9–403(2), the financing statement was effective for a period of five years after it was filed. The plaintiff therefore had a valid security interest in cattle acquired after October 23, 1981 and its security interest was properly perfected. Nevertheless, we cannot say that the plaintiff's interest in or lien upon the 88 head of cattle in issue was superior to the defendants' rights or interest in those cattle without examining Walden's dealings with the defendants.

## II

The plaintiff's second assignment of error is that its motion for judgment n.o.v.

should have been granted because the evidence established as a matter of law that defendants Hopkins did not retain a written security interest in the cattle when Walden acquired possession of and rights in those cattle. The defendants respond by saying that Walden and defendant Bruce Hopkins explicitly agreed that no title to the cattle was to pass to Walden, that Walden was not to acquire an interest in the cattle, brand them or remove any tags. The cattle were, defendants argue, delivered to a holding area by specific agreement, Walden never acquired or took possession of the cattle, and never acquired rights in the cattle sufficient for the plaintiff's interest to attach. Although the issue tendered by this point is developed somewhat differently from the point briefed and argued as point (or subpoint) III, the dispositive question is the same: Did Walden acquire rights in the cattle sufficient for PCA's after-acquired security interest to attach? To resolve this question, it is sufficient to address plaintiff's point III.

## III

The plaintiff's third assignment of error is that its motion for judgment n.o.v. should have been sustained because the rights acquired by Walden in the 88 head of cattle were sufficient for the plaintiff's security interest to attach. In arguing this point and indeed in general, the plaintiff relies heavily upon *In the Matter of Samuels & Co., Inc.*, 526 F.2d 1238 (5th Cir.) (en banc), cert. denied 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). *Samuels* holds many things, and in our view the rationale of the case was considerably clarified by the same court's opinion in *Crocker National Bank v. Ideco Division of Dresser Industries, Inc.*, 839 F.2d 1104, 1109 (5th Cir.1988), cert. denied —— U.S. ——, 110 S.Ct. 1949, 109 L.Ed.2d 312 (1990), to which we have looked to determine the meaning of *Samuels*.

The essential rationale of the *Samuels* case has been followed in varying situations by a number of courts. Some of those precedents have been cited by the plaintiff, e.g., *AMFAC Mortgage Corpora-*

tion v. Arizona Mall of Tempe, 127 Ariz. 70, 618 P.2d 240 (Ariz.App.1980), and First National Bank of Elkhart County v. Smoker, 153 Ind.App. 71, 286 N.E.2d 203 (Ind.Ct.App.1972). The opinion in Samuels represents a prodigious interpretation of the relative rights of a seller and a secured party under Articles 2 and 9 of the Uniform Commercial Code. That analysis was in part carefully restated by our colleagues of the Eastern District in Fricke v. Valley Production Credit Association, 721 S.W.2d 747, 753–54 (Mo.App.1986), thus:

"[In Samuels], the debtor paid for cattle with a check, later returned for insufficient funds, and took delivery of the cattle. The debtor's secured party then seized the cattle under the terms of the security agreement after [the] debtor defaulted and the unpaid cash seller sued the secured party. As in [Fricke], the secured party concededly held a perfected Article Nine security interest which extended to the livestock claimed by the plaintiff.

The court held that the defaulting buyer acquired sufficient rights in the cattle to allow the creditor's lien to attach.... The court reasoned that purchasers can take from a defaulting cash buyer, § 2–403(1) and § 2–401(1) and lien creditors are included as 'purchasers' under § 1–201(32) and (33). Further, a lien is an Article Nine interest. § 9–102 and Comments. Thus:

The Code anticipates a situation where the interest of an unpaid cash seller who has delivered goods to a breaching buyer is subordinated to the interest of 'purchasers' of the buyer. Lien creditors are included in the definition of 'purchasers;' in order that there be lien creditors, the buyer's interest must be great enough to allow attachment. Therefore, however ... [the debtor's] interest upon delivery of the cattle is defined, and however slight or tenuous or marginal it was, it was necessarily great enough to permit attachment of a lien, including C.I. T.'s Article Nine interest.

\* \* \* \* \* \*

Upon non-payment, Samuels lost the right to retain or dispose of the property, but the Code recognizes that the breaching buyer had the power to encumber, despite non-payment, so long as he retained possession. §§ 2.403(a); 1.201(32)(33). In the instant case, this power arose as a result of Stowers' delivery, and it did not terminate while the goods remained in Samuel's hands. The whole point of Article Nine is the continuity of perfected security interests once they have properly attached, despite subsequent loss of control or possession of the collateral by the debtor. § 9.201.... (Emphasis supplied) Samuels, 526 F.2d at 1247."

The court went on to point out that the rationale of the Samuels case had been accepted by a good many courts in varying fact situations and concluded it applied to the appeal before it. Fricke v. Valley Production Credit Association, 721 S.W.2d at 754.

One fact common to the cases which have applied the Samuels decision in litigation involving competition between a reclaiming seller and a secured creditor who asserts an after-acquired property interest is that the buyer has acquired possession of the goods, either actual or constructive. Otherwise put, for a security interest to attach, a debtor must have some degree of control or authority over collateral placed in the debtor's possession. Crocker National Bank v. Ideco Division of Dresser Industries, Inc., 839 F.2d at 1109; Kinetics Technology International Corporation v. Fourth National Bank of Tulsa, 705 F.2d 396, 399[1] (10th Cir.1983). We realize that unless it is otherwise explicitly agreed, title to goods generally passes to the buyer when the seller completes his performance with reference to physical delivery of the goods. § 400.2–401(2). It might be argued, we suppose, that because the 88 head of cattle had been identified to the contract, the buyer acquired a special property and insurable interest in those cattle, but as indicated in Crocker, that special property interest is not an interest to which the plaintiff's after-acquired se-

curity interest could attach. *Crocker National Bank v. Ideco Division of Dresser Industries, Inc.*, 839 F.2d at 1108.

■■■■■ We are unable to find that Walden ever acquired any rights in the cattle sufficient to permit the plaintiff's Article 9 interest to attach. The provisions of the Uniform Commercial Code may be varied by agreement, § 400.1–102(3); *National Heater Company, Inc. v. Corrigan Company Mechanical Contractors, Inc.*, 482 F.2d 87, 90[8] (8th Cir.1973), and defendant Bruce Hopkins testified without objection that he and the debtor, Walden, entered into an oral agreement by the terms of which Walden was to "bid in" 100 head of cattle which were to be assembled or held on a farm owned by Morris Bough. When 100 head of cattle had been identified to the contract Walden was to pay for them and the cattle would then become his. Walden agreed, according to Hopkins, not to remove the tags from the cattle, brand them or do anything else to them. During the time the 88 head of cattle were being accumulated, Walden did not care for or feed the cattle. Walden never removed any of the cattle to his farm. Hopkins himself paid $2,900 for feed, veterinary medicine and pasture for the 88 head, and eventually paid the sale price of the cattle. We bear in mind that the agreement between Hopkins and Walden was a contract for the sale of goods for the price of $500 or more. The contract appears to be a contract to which § 400.2–201, one of the U.C.C. statutes of frauds, applies. The plaintiff made no objection to the evidence which established the contract, however, and its failure to object constituted a waiver of the statute of frauds as a defense. *Vess Beverages, Inc. v. Paddington Corporation*, 886 F.2d 208, 212 (8th Cir.1989); *Sheinbein v. First Boston Corporation*, 670 S.W.2d 872, 879 (Mo.App.1984); *Justus v. Webb*, 634 S.W.2d 567, 569 (Mo.App.1982).

To reiterate what we have already said or suggested, it cannot be said that the evidence compels the conclusion, as a matter of law, that Walden ever took possession or became entitled to take possession of the cattle. The defendants vigorously argue that Walden never acquired any rights in the 88 head of cattle, nor took possession of them, and never acquired any rights to or interest in them. In the circumstances presented, we must agree. A holding that Walden could transfer a security interest to the plaintiff would contravene the general principle that one cannot encumber another person's property. We affirm the judgment of the trial court.

FLANIGAN, C.J., and PARRISH, P.J., concur.