**In re Darin Lee CARTER and Lori Lee Carter, Debtors.**

**DIAMOND BANK, Plaintiff,**

v.

**Darin Lee CARTER and Lori Lee Carter, now Lori Lee Clapper, Defendants.**

**Bankruptcy No. 96–30015–ABF.**
**Adversary No. 96–3026–ABF.**

United States Bankruptcy Court,
W.D. Missouri.

Nov. 22, 1996.

Norman E. Rouse, Collins, Webster & Rouse, Joplin, MO, for Plaintiff.

J. Kevin Checkett, Checkett & Pauly, Carthage, MO, for Defendants.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Plaintiff Diamond Bank (the "Bank") objects to debtors/defendants' (the "debtors") discharge pursuant to 11 U.S.C. § 727(a)(2), (4), and (5), as well as to the dischargeability

of its debt pursuant to 11 U.S.C. § 523(a)(2)(A) and (B). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find that the Bank has no deficiency debt, therefore, the dischargeability cause of action is moot. I further find that the bankruptcy discharge should be denied as to debtor Lori Lee Carter.

## FACTUAL BACKGROUND

Debtors, who are dairy farmers, filed their bankruptcy petition on January 9, 1996. This adversary proceeding involves a number of transactions between the debtors and the Bank. Darin Carter first began conducting business with the Bank in 1992 when he borrowed money to purchase cattle. In early 1993 Darin consolidated his debts with the Bank by applying for and receiving a Farmer's Home Administration (the "FmHA") guaranteed loan. Pl.Ex. # 2. In May of 1994 Darin Carter sought to consolidate his debts once more by obtaining another FmHA guaranteed loan. Pl.Ex. # 4. On each occasion, when Darin sought the FmHA guaranty, he updated his financial statement with the Bank.

On May 7, 1993, Darin and the Bank executed a Promissory Note and Security Agreement. Def. Ex. # 17. The Bank agreed to loan Darin Carter the sum of $185,000.00 secured by livestock and equipment, among other things (the "Equipment Plus Loan"). *Id.* The Security Agreement contains a future advance clause and an after-acquired property clause. *Id.*

In October of 1994 Darin married Lori Clapper, who thereafter went by the name Lori Carter. They have sinced divorced, and she now goes by the name Lori Clapper. Lori testified that sometime prior to her marriage to Darin, she had purchased a house in Monett, Missouri for her father, Henry Clapper. She stated he was in the process of obtaining a divorce and he needed a home, so he asked her to sign the docu-

ments. The house was titled in Lori's name, though she claims she never made any payments on the mortgage or considered the house her property. She also testified that shortly before she married Darin, she executed a Quit–Claim Deed purporting to transfer the property to Henry Clapper. The Quit–Claim Deed was dated and notarized as of October 4, 1994, but it was never recorded. This Court was notified after the hearing, by debtors' counsel, that the Quit–Claim Deed was in fact notarized sometime after the bankruptcy filing, and that the notarization was backdated.[1] Despite Ms. Carter's testimony, that she signed the deed on October 4, 1994, the property in Monett is listed as property of the debtors in financial statements which were signed by both Lori and Darin on June 12, 1995, September 9, 1995, October 4, 1995, and November 9, 1995, and submitted to the Bank.

On June 12, 1995, both Darin and Lori executed a Promissory Note with the Bank in the amount of $10,023.00, secured by "CROPS, GRAINS, FEEDS, SEED, FERTILIZER, 70 ACRES CORN". (the "Crop Loan"). Pl.Ex. # 26. This loan was extended on November 20, 1995, for an additional six months, becoming due and payable on May 20, 1996. Pl.Ex. # 28. The Promissory Note contains both a future advance clause and an after-acquired property clause on its face and a cross-collateralization clause on its reverse side. Pl.Ex. # 26. It is undisputed that the specific collateral for which the loan was made is gone. There is an issue as to the secured status of the loan, however, given the future advance, after-acquired property, and cross-collateralization clauses in the Promissory Note.

In conjunction with this transaction, Darin executed a new Security Agreement granting the Bank a security interest in all of his livestock and equipment now owned or hereinafter acquired. Pl.Ex. # 7. Such security agreement also granted a security interest in crops and a lease assignment. All of the collateral listed in the security agreement was owned by Darin prior to his marriage to

---

1. I commend Mr. Checkett for immediately notifying opposing counsel, and the Court, upon learning that the notarization was falsely dated.

Lori, and the FmHA had guaranteed the loans for this same collateral. Therefore, Lori did not sign the Security Agreement. She did, however, sign a Guaranty with Darin in which she and Darin agreed "jointly and severally, to pay to Diamond Bank of Diamond, Missouri ... all indebtedness" which either of them owes now or hereafter. Pl.Ex. # 8.

Debtors also signed a financial statement on June 12, 1995. Pl.Ex. # 6. For the first time, the house in Monett, Missouri, valued at $75,000.00, is listed on said financial statement.

In September of 1995 debtors began negotiations with Diamond Bank in order to obtain another FmHA guaranteed loan to consolidate all their debts. To that end they signed a Farm and Home Plan for the purpose of describing their assets, liabilities, and cash flow. Pl.Ex. # 12. Debtors sought to borrow $323,750.00 to consolidate all debts, purchase some real estate, and increase the size of the herd.

Chris Hoyer, the bank's Vice President, testified that Lori agreed to grant the Bank a second Deed of Trust on the Monett, Missouri real estate in order to further secure the anticipated FmHA loan. While the loan application with FmHA was pending, debtors found a herd of cattle for sale, and informed the Bank that they believed they needed to move quickly to purchase such herd, before the FmHA loan could be approved. Lori contacted the Bank and the parties negotiated a short-term loan to allow for the purchase of the cattle (the "Livestock Loan"), to be repaid from the proceeds of the anticipated FmHA loan. This Livestock Loan was made on November 9, 1995. The next day, November 10, 1995, Lori informed the Bank that the house in Monett could no longer be considered as collateral for the FmHA guaranteed loan because she was selling it to her father. Def.Ex. # 12. Thereafter, FmHA declined to make the new loan to debtors.

The Livestock Loan came due on January 9, 1996. On that same date debtors filed their Chapter 12 bankruptcy petition. Debtors then voluntarily converted the case to Chapter 7 on April 5, 1996. By consent of the parties, the automatic stay was lifted and Diamond Bank repossessed its collateral, including equipment and 125 head of cattle, on April 1, 1996. Prior to the Bank's repossession, Henry Clapper removed thirty head of cattle which debtors claim belonged to him.

The Bank immediately liquidated the cattle repossessed by it. Pl.Ex. # 20. In due course, the equipment was sold by the Bank as well. No written notice was given by the Bank to debtors as to the sale of any of the Bank's collateral.

The Bank brought this adversary proceeding objecting to the discharge of its debt, claiming that the debtors misrepresented the number of cattle owned by them in applying for the November 9, 1995 Livestock Loan. The Bank also claims that debtors represented to it that Lori owned real estate in Monett, Missouri valued at $75,000.00, which she now contends had been previously transferred to her father. The Bank contends that it relied on such representations, and that they were false, in making the Livestock Loan, and that such loan should therefore not be discharged. 11 U.S.C. § 523(a)(2)(B).

The Bank next objects to debtors' discharge, claiming that debtors have not adequately explained the decline in the number of cattle owned by them. 11 U.S.C. § 727(a)(5). The Bank also claims debtors fraudulently transferred collateral to Henry Clapper. 11 U.S.C. § 727(a)(2). Finally, the Bank claims that debtors made a false oath when filling out their original bankruptcy schedules by failing to list the house in Monett, Missouri as an asset of their estate. 11 U.S.C. § 727(a)(4)(A).

Debtors, as an affirmative defense to the section 523 dischargeability counts, claim that the Bank has no deficiency, therefore no debt, to except from discharge because the Bank did not give written notice to the debtors prior to selling its collateral, as is ordinarily required by Missouri's version of the Uniform Commercial Code. Various other affirmative defenses are made as to the discharge counts. I will deal first with issues concerning the dischargeability of the Bank's debt, and then with the Bank's objection to debtor's discharge as to all creditors.

## DISCUSSION

### A. NOTICE

■ The Bank does not dispute that it failed to give written notice to the debtors prior to selling either the cattle or equipment. The first issue, therefore, is whether the failure to give notice to debtors defeats any claim the Bank has to a deficiency. If there is no deficiency, there is no debt. If there is no debt, then Counts I and II of this adversary proceeding, as to dischargeability of the Bank's debt, are moot. Missouri law determines a creditor's right to a deficiency following the repossession of personal property secured by a properly perfected security interest. *See* Mo.Stat.Ann. § 400.9–504(2). Missouri law provides that:

> (3) Dispositions of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcel and at any time and place and on any terms but every aspect of the Disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor....

Mo.Stat.Ann. § 400.9–504(3). It is undisputed that the right to a deficiency exists only if the creditor strictly complies with these statutory requirements. *Executive Financial Serv., Inc. v. Garrison,* 722 F.2d 417, 418 (8th Cir.1983); *Commerce Bank of St. Louis, N.A. v. Dooling,* 875 S.W.2d 943, 946 (Mo.Ct. App.1994); *Ford Motor Credit Co. v. Freihaut,* 871 S.W.2d 129, 130–31 (Mo.Ct.App. 1994); *Boatmen's Bank of Pulaski County v. Brooks,* 869 S.W.2d 781, 783 (Mo.Ct.App. 1994). Likewise, a guarantor is a debtor entitled to notice as a prerequisite to the collection of a deficiency from the guarantor. *RWR, Inc. v. DFT Trucking, Inc.,* 899 S.W.2d 875, 878 (Mo.Ct.App.1995); *Lankheit v. Estate of Scherer,* 811 S.W.2d 853, 858 (Mo.Ct.App.1991); *Cherry Manor, Inc. v.*

*American Health Care, Inc.,* 797 S.W.2d 817, 821 (Mo.Ct.App.1990); *Sedalia Mercantile Bank and Trust Co. v. Loges Farms, Inc.,* 740 S.W.2d 188, 195 (Mo.Ct.App.1987); *Lendal Leasing, Ltd. v. Farmer's Wayside Stores, Inc.,* 720 S.W.2d 376, 379 (Mo.Ct.App. 1986). Voluntary surrender of the collateral by the debtor does not negate the necessity for written notice of the sale of collateral by the creditor, and a debtor's right to written notice cannot be waived or varied by any pre-default agreement. *RWR, Inc. v. DFT Trucking, Inc.,* 899 S.W.2d at 878.

■ The Bank argued that this Court's Order lifting the automatic stay dispensed with any state law requirement for written notice prior to disposition of the collateral. The Bank cited no cases to support this proposition. In *State Bank of Hallsville v. Hull,* 148 B.R. 917, 918 (Bankr.W.D.Mo. 1993), the Court held that the no notice, no deficiency rule is unaffected by creditor's claim that the debt was incurred by fraud or misrepresentation. In *In re Boehne,* 82 B.R. 525, 529 (Bankr.W.D.Mo.1988), the Court held that once a creditor takes possession of personal property and sells it without notice, it is prohibited from any further recovery of the debt, and with no debt, a creditor cannot proceed with a fraudulent conveyance action. Other courts have held that a sale pursuant to an Order of a bankruptcy court lifting the automatic stay does not dispense with the notice requirement prior to a sale of the collateral. *See, e.g., In re Hull,* 155 B.R. 515, 516 (Bankr.W.D.Mo.1993); *Fidelity Nat'l Bank v. Winslow (In re Winslow),* 39 B.R. 869, 871 (Bankr.N.D.Ga.1984).

There are, however, three exceptions to the no notice, no deficiency rule. A creditor may dispense with notice if the collateral is perishable, threatens to decline speedily in value or is of a type customarily sold on a recognized market. Mo.Stat.Ann. § 400.9–504(3) (1994). As to the cattle, the evidence shows that at least one of these exceptions—threatens to speedily decline in value—may well be applicable. Many of the cattle were sick and hungry and, being dairy cattle, need to be milked regularly. *Compare, Boatmen's Bank of Nevada v. Dahmer,* 716 S.W.2d 876 (Mo.Ct.App.1986). However, no such excep-

tion applies as to the machinery. And as will be shown, because of future advances and after acquired collateral provisions in the loan documents, the machinery served as collateral for all the loans at issue. Therefore, the no notice, no deficiency rule wipes out any claim by the Bank for a deficiency.

## B. FUTURE ADVANCES AND AFTER-ACQUIRED COLLATERAL CLAUSES

This discussion centers on the interrelationship between three transactions: (1) the Equipment Plus Loan of May 7, 1993; (2) the Crop Loan of June 12, 1995; and (3) the Livestock Loan of November 9, 1995. Debtors argue that the future advance clause and after-acquired property clause in the Equipment Plus Loan's Security Agreement caused the equipment to serve as security for both the Crop Loan and the Livestock Loan. Def.Ex. # 17. Therefore, even if the Bank did not have to give written notice as to the cattle, there is no exception to the no notice, no deficiency claim as to the equipment. The Bank does not dispute that it failed to give written notice prior to disposing of debtors' equipment, and concedes that it has waived its deficiency claim as to the Equipment Plus Loan. The issue is whether that equipment served as collateral for the other two loans, such that the defective notice wipes out any deficiency claim as to those loans as well.

Future advance clauses, after-acquired property clauses, and cross-collateralization clauses are sometimes referred to as "dragnet" clauses, in that they purport to include within their coverage all of the indebtedness of the debtor to the creditor, whether incurred before or after the execution of the document containing said clauses. *Western Farm Credit Bank v. Auza (In re Auza)*, 181 B.R. 63, 66 (9th Cir. BAP 1995). Usually, it is the lender who is trying to enforce the "dragnet" clauses in its loan documents in order to obtain priority. Mo.Stat.Ann. § 400.9–312. This case is unique in that it is the debtors who are the proponents of the "dragnet" clauses, while the Bank claims they did not intend them to be enforceable. For purposes of this proceeding, I must first determine if the clauses are enforceable. If so, then the equipment served as collateral for all the loans, so the sale of such equipment without notice would eliminate any deficiency claims as to any of the three loans.

The law of the state in which a loan is executed is applied to determine the enforceability of "dragnet" clauses in the loan documents. *Id.* at 68. The transaction at issue here is controlled by Article 9 of the Uniform Commercial Code (the "UCC"), which sets out a comprehensive scheme for the regulation of security interests in personal property and fixtures. Mo.Stat.Ann. § 400.9–101 (1994), Comment. Article 9 specifically validates after-acquired property interests, and will enforce such clauses. Mo. Stat.Ann. §§ 400.9–108 [2] and 400.9–204(1) [3]. Likewise, Article 9 provides that collateral may secure future advances as well as present advances if the security agreement so provides. Rev.stat. Mo. § 400.9–204(3) (1994), Comment 5.[4] In Missouri such clauses are enforceable, whether a party is claiming an interest in after-acquired collateral, or claiming a security interest based on future advances, as long as the obligation is covered by the security agreement. *Id.* See also

---

**2.** Section 400.9–108 provides:

Where a secured party makes an advance, incurs an obligation, releases a perfected security interest, or otherwise gives new value which is to be secured in whole or in part by after-acquired property his security interest in the after-acquired collateral shall be deemed to be taken for new value and not as security for an antecedent debt if the debtor acquires his rights in such collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given. Rev.Stat.Mo. § 400.9–108 (1994).

**3.** Section 400.9–204 provides:

(1) Except as provided in subsection (2), a security agreement may provide that any or all obligations covered by the security agreement are to be secured by after-acquired collateral. Rev.Stat.Mo. § 400.9–204(1).

**4.** Section 400.9–204(3) provides:

(3) Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment (subsection (1) of section 400.9–105). Rev. stat. Mo. § 400.9–204(3).

**704**

*Central Production Credit Ass'n v. Hopkins,* 810 S.W.2d 108, 111 (Mo.Ct.App.1991); *Fricke v. Valley Production Credit Assn,* 721 S.W.2d 747, 754–55 (Mo.Ct.App.1986); *Darr v. Brennan Cattle Co.,* 658 S.W.2d 906, 909 (Mo.Ct.App.1983); *Drysdale v. Cornerstone Bank,* 562 S.W.2d 182, 185 (Mo.Ct.App.1978); *Index Store Fixture Co. v. Farmers' Trust Co.,* 536 S.W.2d 902, 906 (Mo.Ct.App.1976). *See also Ex parte Chandler v. Chandler (In re First Southern Development Corp.),* 477 So.2d 360, 362 (3) (Ala.1985); *Allis Chalmers Credit Corp. v. Cheney Inv., Inc.,* 227 Kan. 4, 10, 605 P.2d 525, 529 (1980); *Blue v. H–K Corp.,* 629 P.2d 790, 791 (Okla.Ct.App.1981). There are no "magic words" which create a security interest in after-acquired property, but in general "any words which reasonably indicate an intention to create such an interest are sufficient." *Central Production Credit,* 810 S.W.2d at 111.

█ Under common law, and under statutes in existence before the adoption of Article 9, courts were prejudiced against both after-acquired property clauses and future advance clauses in loan documents. Mo.Stat. Ann. § 400.9–204 (1994), Comment 5. But, the law in Missouri is very clear that such clauses are now enforceable provided the intention of the parties to create such an interest is readily apparent from the language of the document.

The loan documents at issue in this case do contain both after-acquired property clauses and future advance clauses. The Security Agreement of May 7, 1993, signed only by Darin Carter provides:

This security interest is given to secure: (1) Payment of a note dated May 7, 1993, executed and delivered by Debtor to Bank in the principal sum of $185,000.00, payable as to principal and interest as therein provided; (2) *future advances to be evidenced by like notes to be made by Bank to Debtor at Bank's option;* (3) all expenditures by Bank for taxes, insurance, repairs to and maintenance of the Collateral and all costs and expenses incurred by Bank in the collection and enforcement of the note and other indebtedness of Debtor; and (4) *all liabilities of Debtor to Bank now existing or hereafter incurred, matured or unma-*

*tured, direct or contingent, and any renewals and extensions thereof and substitutions there-mature or unmatured, direct or contingent, and any renewals and extensions thereof and substitutions therefor.*

*Id.* (emphasis added). The Security Agreement of June 12, 1995, also signed only by Darin Carter provides:

This security interest is given to secure: (1) Payment of a note dated May 7, 1993 $185,000.00 [and] September 3, 1993 $46,000.00, executed and delivered by Debtor to Bank in the principal sum of $231,000.00, payable as to principal and interest as therein provided; (2) *future advances to be evidenced by like notes to be made by Bank to Debtor at Bank's option;* (3) all expenditures by Bank for taxes, insurance, repairs to and maintenance of the Collateral and all costs and expenses incurred by Bank in the collection and enforcement of the note and other indebtedness of Debtor; and (4) *all liabilities of Debtor to Bank now existing or hereafter incurred, matured or unmatured, direct or contingent, and any renewals and extensions thereof and substitutions there-matured or unmatured, direct or contingent, and any renewals and extensions thereof and substitutions therefor.* On this 12th Day of June 1995 the principal balance of the above described Security Agreements is $177,900.07 and is provided for the purpose of security update to the Lender, Diamond Bank, Diamond, Missouri.

Pl.Ex. # 2 (emphasis added). I note that this "Future Advance Clause" specifically identified the antecedent debts secured by the Security Agreement. I also note that debtors did not introduce a separate Security Agreement for the Crop Loan or the Livestock Loan. The Promissory Note of June 12, 1995, provides that it is secured by "CROPS, GRAINS, FEEDS, SEED, FERTILIZER, 70 ACRES CORN." Pl.Ex. # 26. The Promissory Note of November 9, 1995, provides that it is secured by "92 head of Holstein cows and offspring." Pl.Ex. # 25. Both the Crop Loan Promissory Note and the Livestock Loan Promissory Note are on the same form and both state "I give you a security interest in the Property described

below. The rights I am giving you in this Property and the obligations this agreement secures are defined on page 2 of this agreement. NOTICE—The Property that serves as collateral for this security agreement may also serve as collateral for future advances." Pl.Ex. ## 25 and 26. The Notes further provide that "collateral securing other loans with you may also secure this loan." *Id.* On page two the Notes state that "[a]ny present or future agreement securing any other debt I owe you will secure the payment of this loan." *Id.*

The language in these documents is clear and unambiguous. The equipment which secured the Equipment Plus Loan also secured later loans made by the Bank to these debtors. The Crop Loan was secured by any other collateral in which the Bank holds a valid security interest. The Livestock Loan was also secured by any other collateral in which the Bank held a security interest for any other loans made to either of the debtors. I find that the "dragnet" clauses as written in these documents are enforceable, therefore, the Bank is a secured party subject to the provisions of section 400.9–504(3) as to the disposition of all of its collateral. Mo.Stat.Ann. § 400.9–504(3). In *Reeves v. Habersham Bank,* 254 Ga. 615, 331 S.E.2d 589 (1985), the Reeves, who had guaranteed a $35,000.00 note, signed agreements to hypothecate certain stock owned by them as collateral for such note. The $35,000.00 note provided that its collateral was given to "secure the payment of this Note and all other indebtedness or liability of the obligor, Thomas Sexton, to Habersham Bank." Mr. Sexton had a separate $200,000.00 note, which was collateralized by the assets of a hardware store, but not guaranteed by the Reeves. The hardware store assets were sold without notice to the Reeves, and the proceeds were applied on the $200,000.00 note. The Reeves brought suit to cancel the guaranty of the $35,000.00 note, contending that they should have received notice even though they were not obligated on the $200,-000.00 note. The Court found that "notice is required to be given to the owner of collateral, if that collateral could be used to satisfy any possible deficiency arising from a foreclosure sale." *Id.,* at 596.

Since I find that the cross-collateralization clauses are enforceable in these loan documents, the Bank could have chosen to use the proceeds from the sale of debtors' equipment to satisfy any deficiency remaining from the sale of debtors' livestock. As such, debtors' had a statutory right to notice of said sale in order to preserve their right to insure that the highest possible price was obtained for the equipment. Since it failed to comply with the strict requirements of section 400.9–504(3), the Bank is not able to claim a deficiency. This is a harsh result. However, the "purpose of the Code [UCC] can be achieved only by enforcing its provisions, and a party who chooses to ignore state law must take a calculated risk that loss will result." *Fricke v. Valley Production Credit Assn,* 721 S.W.2d 747, 755 (Mo.Ct.App.1986).

### C. OBJECTION TO DISCHARGE

The Bank challenged debtors discharge pursuant to 11 U.S.C. § 727(a)(2), (4), and (5). Section 727 provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

.        .        .        .        .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

.        .        .        .        .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

.        .        .        .        .

(5) the debtor has failed to explain satisfactorily, before determination of denial

of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a). Bankruptcy relief is an equitable doctrine and bankruptcy courts are courts of equity. *In re Global W. Development Corp.,* 759 F.2d 724, 727 (9th Cir.1985). As such, the relief afforded by a discharge of debts enables the *honest debtor* to make a "fresh start." The emphasis here is on the honesty of the debtor. It only takes a showing that a debtor intended to defraud one creditor in order for the Court to deny the discharge. *First Beverly Bank v. Adeeb (In re Adeeb),* 787 F.2d 1339, 1343 (9th Cir.1986).

▬ The standard of proof in 11 U.S.C. § 727 proceedings is a preponderance of evidence standard. *Cullen Center Bank & Trust v. Lightfoot (In re Lightfoot),* 152 B.R. 141, 146 (Bankr.S.D.Tex.1993) *citing First National Bank v. Serafini (In re Serafini),* 938 F.2d 1156, 1157 (10th Cir.1991); *Hubbell Steel Corp. v. Cook (In re Cook),* 126 B.R. 261, 265 (Bankr.E.D.Tex.1991).

▬ In order for this Court to deny debtors' discharge pursuant to 11 U.S.C. § 727(a)(2), the Bank must prove that debtors transferred or concealed assets either within one year of the bankruptcy filing, or after such filing, with intent to hinder, delay or defraud a creditor. As such the Bank must prove the following elements:

(1) That the transfer of property occurred;

(2) That the property transferred was owned by the debtor;

(3) That the transfer occurred within one year before the date the bankruptcy petition was filed [or after the case was filed]; and

(4) That the debtor had, at the time of the transfer, the intent to defraud a creditor.

*In re Cook,* 126 B.R. 261, 266 (Bankr. E.D.Tex.1991). The Bank alleges that Lori transferred property to which she held legal title in order to defraud the Bank. Debtors' financial statements indicate debtor owned a house in Monett, Missouri valued at $75,000.00. Lori notified the Bank on November 10, 1995, one day after the Bank loaned the debtors $78,865.81, that she was selling the house to her father for the loan payoff balance. Def. ex. # 12. The mortgage at that time was approximately $58,000.00. Pl.Ex. # 23. If the transfer occurred in November 1995, it was within one year of the bankruptcy filing. Lori then testified at the hearing on October 24, 1996, that she had actually transferred the deed to the house in Monett to her father by deed signed on October 4, 1994, a date which is more than one year prepetition. Pl.Ex. # 24. As stated, however, Lori had signed financial statements after that date listing the house as an asset. And, debtors' counsel later informed this Court that the deed, dated October 4, 1994, was not notarized until sometime after the bankruptcy filing.[5] In light of these facts, I find that the property in Monett, Missouri was transferred to Henry Clapper no earlier than November 9, 1995. The first three elements of section 727(a)(2) are, therefore, met.

▬ As to the final element, intent is rarely subject to direct proof. *Newton v. Essres (In re Essres),* 139 B.R. 958, 962 (Bankr.D.Colo.1992). Rather it is established by circumstantial evidence. *McCormick v. Security State Bank,* 822 F.2d 806, 808 (8th Cir.1987). *See also Lightfoot,* 152 B.R. at 147. Fraudulent intent is presumed in cases in which a debtor has gratuitously conveyed valuable property to another. *Abbott Bank–Hemingford v. Armstrong (In re Armstrong),* 931 F.2d 1233, 1239, *reh'g denied,* June 10, 1991. Once such a transaction

---

5. I note that Missouri law requires that "[a]ll deeds or other conveyances of lands, or of any estates or interest therein, shall be subscribed by the party granting the same, or by his lawful agent, and shall be acknowledged or proved and certified in the manner herein prescribed." Mo. Stat.Ann. § 442.130 (1986). The law in Missouri is also quite clear that an acknowledgement is not essential to give effect to a deed as between the two parties. *Schroeder v. Turpin,* 253 Mo. 258, 161 S.W. 716 (1913); *Blackburn v. Spence,* 384 S.W.2d 535, 539 (Mo.1964). The purpose of acknowledgement is to allow the instrument to be recorded to protect creditors and subsequent purchasers. *Pine Lawn Bank & Trust Co. v. Urbahns,* 417 S.W.2d 113, 119 (Mo.Ct.App.1967). This deed was never recorded. As between Lori and Henry Clapper, however, the deed was transferred when the parties intended the transfer to take place and the deed was delivered. *Haer v. Christmas,* 312 S.W.2d 66, 68 (Mo.1958).

has been shown by the plaintiff, the burden then shifts to the debtor to prove that his intent was not to hinder, delay, or defraud. *Id.* Some factors to consider when determining if a debtor intended to defraud creditors are:

(1) lack or inadequacy of consideration;

(2) family, friendship, or other close relationship between transferor and transferee;

(3) retention of possession, benefit, or use of the property in question;

(4) financial condition of the transferor prior to and after transaction;

(5) conveyance of all of debtor's property;

(6) secrecy of the conveyance;

(7) existence of trust or trust relationship;

(8) existence or cumulative effect of pattern or series of transactions or course of conduct after pendency or threat of suit;

(9) instrument effecting the transfer suspiciously states it is in fact bona fide;

(10) debtor makes voluntary gift to family member; and

(11) general chronology of events and transactions under inquiry.

*Lightfoot,* 152 B.R. at 147 (citations omitted). Courts have found that any one of these factors can be a sufficient basis on which to find the requisite intent, and that the presence of more than one strongly indicates that the debtor did, in fact, possess the requisite intent. *Id.* (citing *Farmers and Merchants Bank v. Titus (In re Titus),* 75 B.R. 256, 259–60 (Bankr.W.D.Mo.1985)). I find in this case that debtor transferred property for no consideration to a family member. I find that debtor attempted to keep the status of the property a secret, and that the deed is at best suspect. At least four of these factors are, therefore, present in this case. I also find that there is no evidence that Darin Carter participated in this deception. He has never had any interest in the house in Monett, Missouri. His signature is not on the deed. For all of the above reasons, the discharge is denied as to Lori Clapper only pursuant to 11 U.S.C. § 727(a)(2).

■ Since I have found a basis for denying Lori's discharge, I need not consider the other objections to discharge as to her. As to Darin, the Bank also objects to discharge on the ground that he made a false oath in connection with the bankruptcy case. While debtors' original schedules contain some inaccuracies and omissions, debtors did file corrected schedules after the case was converted to Chapter 7. In light of those corrections, I cannot find that Darin knowingly and fraudulently lied when he signed his bankruptcy schedules.

■ Finally, the Bank claims that Darin failed to satisfactorily explain the loss of some of the cattle. Once the plaintiff demonstrates a loss of assets, the burden of proof shifts to the debtor to explain the loss. *Associated Grocers Co. v. Ransom (In re Ransom),* 75 B.R. 684, 686 (Bankr.E.D.Mo.1987). If the debtor's explanation is too vague, indefinite, or unsatisfactory then the debtor is not entitled to a discharge. *Id.* The debtors attempted to explain the discrepancy in the number of cattle still on the farm on April 1, 1996. I find, however, the Bank's own testimony regarding the number of dead animals on the farm prior to the Bank's repossession to be significant. Chris Hoyer testified that he found a pit with an undeterminable number of dead animals when he visited the farm. Eugene Hoyer testified that he observed carcasses when he went to repossess the livestock. The Bank did not attempt in this case to challenge debtors' claim that Henry Clapper did, in fact, own the thirty head of cattle which he removed from the farm prior to the repossession. Since it is undisputed that a number of the cattle died, and that Henry Clapper removed thirty head of cattle he contends are owned by him, I find that the Bank did not meet its burden of proving there was an unexplained loss of assets.

In summary, the future advance clause and the after-acquired property clause in the loan documents of May 7, 1993, are enforceable in Missouri. Therefore, all collateral debtors acquired after that time secured said loan. Further, the cross-collateralization clause in the Livestock Loan document brought the equipment into the ambit of that security agreement. As a result, when the Bank sold debtors' equipment without written notice

pursuant to section 400.9–504(3) of Missouri's Revised statutes, the Bank lost its right to a deficiency as to all the obligations due it. Since there is no deficiency, there is no debt to be excepted from discharge. The discharge of Lori Clapper, however, is denied pursuant to 11 U.S.C. § 727(a)(2).

An Order in accordance with this Memorandum Opinion will be entered this date.