### In re Myron J. KLOUBEC, Ellen K. Kloubec, dba Kloubec Fish Farms, Debtors.

### Bankruptcy No. 99–02325C.

United States Bankruptcy Court, N.D. Iowa.

March 14, 2000.

Michael Malleney, Des Moines, IA, for debtors.

H. Raymond Terpstra II, Cedar Rapids, IA, for Creditor Farmers Savings Bank.

John Titler, Cedar Rapids, IA, for Creditor Dennis Drahos.

Carol Dunbar, Waterloo, IA, Chapter 12 Trustee.

Janet Reasoner, Cedar Rapids, IA, U.S. Trustee.

## ORDER

PAUL J. KILBURG, Chief Judge.

On February 10, 2000, the above-captioned matter came on for hearing on the U.S. Trustee's Motion to Convert and Farmers Savings Bank's Motion to Dismiss. Debtors appeared with Attorney Michael Malleney. Farmers Savings Bank appeared by Attorney H. Raymond Terpstra. The Chapter 12 Trustee, Carol Dunbar, was present. Also present was Assistant U.S. Trustee Janet Reasoner. Attorney John Titler appeared representing the interests of Creditor Dennis Drahos. Evidence was presented and the Court took the matter under advisement. The time for filing briefs has passed and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (G).

## STATEMENT OF THE CASE

Debtors own property in Iowa County, Iowa upon which they have ponds wherein they raise various species of fish for commercial purposes. Debtors are also in the process of expanding a bait sale operation from the same property. Debtors' primary source of financing has been the Farmers Savings Bank (FSB) of Walford. They have executed security agreements to secure payment of notes held by the FSB. Debtors filed their Chapter 12 petition on August 31, 1999. The U.S. Trustee's Office filed a Motion to Convert to Chapter 7 on January 6, 2000. The Motion is based on allegations of fraud. FSB filed a Motion to Dismiss on January 3, 2000. This Motion is based on the allegation that Debtors do not qualify as family farmers as defined in 11 U.S.C. § 101(18). The Motion to Dismiss and the Motion to Convert are the subjects of this hearing.

## FINDINGS OF FACT

To finance their fish and bait operation, Debtors have obtained most of their financing through FSB. Debtors and FSB have a series of security agreements dating from October of 1986 and September of 1993 giving the Bank security interests in the fish, implements, machinery, accounts receivable, personal property as well as real property of Debtors and their business operation. The validity of the security agreements was determined by the Court in October of 1999 after a challenge by Debtors.

Debtors did not timely make their contractual payments to FSB. In April of

1999, an order was entered in State Court in Johnson County, Iowa giving the Bank an immediate right to replevin the fish. On August 31, 1999, the day before the replevin order was to become effective, Debtors filed the pending Chapter 12 petition.

Debtors filed a Plan of Reorganization to which many objections were filed. A preliminary confirmation hearing was held and it was apparent that the Plan was unconfirmable on its face. Under the Schedules as filed, Debtors list assets of $1.229 million and liabilities of $1.149 million. The schedules fail to list numerous assets. Debtors' own liquidation analysis shows at least $63,000 available for unsecured creditors. However, Debtors' Plan proposes to pay $30,000 to unsecured creditors over a period of three years.

Irregularities in the schedules are apparent. Debtors did not file tax returns for 1998, or for calendar year 1999. As such, their income and other financial records have been difficult to verify. Additionally, when FSB, as the largest creditor, attempted to make discovery, it was met with continuous resistance. Attempts to complete discovery by FSB were protracted and litigated at every stage by Debtors. Nevertheless, FSB and the U.S. Trustee's Office have discovered matters upon which they base their motions. These matters will be discussed separately.

### DISCLAIMER OF INHERITANCE

Myron Kloubec stood to inherit a portion of the estate of his grandfather, William J. Kloubec. This matter was being probated in Linn County District Court and the major asset of the probate estate was certain real estate located near the Cedar Rapids Airport. Initial valuations place Myron Kloubec's interest between $80,000 and $85,000. However, evidence establishes that this estate may be worth substantially more. Debtor stood to inherit 1/8 of this estate and his interest may be in excess of $85,000. Debtor executed a disclaimer of this inheritance on August 26, 1999 and filed it in probate court the

day before the filing of the bankruptcy petition. Under rules of succession, Myron Kloubec's disclaimer effectuated a transfer of his interest to his two children, Nicholas and Meghan Kloubec.

### UNLISTED ASSETS

FSB and the U.S. Trustee allege that Debtors have failed to schedule substantial assets. One category of unlisted assets relates to Debtor Ellen Kloubec's jewelry. She admits that she owns a diamond tennis bracelet which was acquired several years prior to the bankruptcy. This asset is not listed in the schedules. Neither Debtor provided a value for this bracelet. A diamond pendant with a value of approximately $1,450 is also owned by Ellen Kloubec and not scheduled.

Ellen Kloubec has a diamond wedding ring. In 1997, the original stone was replaced with a stone having a value of approximately $5,300. The stone which was replaced was approximately 1/4 carat. This 1/4 carat stone is unvalued and is not scheduled. Ellen Kloubec testified that she did not know the location of this diamond. While the new stone was listed in the schedules, it was valued at substantially less than $5,300 and claimed exempt even though replacement wedding jewelry is not exempt under Iowa exemption law.

It is uncontested that certain figurines and a mission oak desk are property of Debtors and not scheduled.

Debtors also have business interests in Canada and in South America. In 1999, Myron Kloubec made several trips to Costa Rica. This was under a consulting contract or oral agreement. Myron Kloubec testified that he did not have a written agreement though he anticipated that he would be paid $20,000 plus expenses. Neither the consulting relationship agreement nor the claim for expenses are scheduled. While the extent of Debtors' interests in Canada are unclear, Debtors have equipment and machinery in Canada. Under financial statements prepared for FSB in

September, 1998, Debtors listed farm assets in Canada with a value in excess of $17,000. Debtors' schedules fail to list any assets from this Canadian enterprise.

## DUPLER LOANS

At about the time of the filing of the Chapter 12 petition, a series of transactions occurred between Debtors and Ellen Kloubec's mother, Sandra Dupler, which can best be characterized as curious. Prior to filing, Debtors owned an unencumbered 1996 Dodge pickup. On August 30, 1999, the day before the filing of the petition, Myron Kloubec purchased a 2000 Ford F–550 pickup from Don's Truck Sales, Inc. for $33,175. He traded in the 1996 Dodge and received a trade-in value of $13,250. However, he did not pay for the pickup nor take delivery on that date.

Mr. Kloubec had previously contacted his mother-in-law to obtain funds for the remainder of the purchase which totaled $20,999. Though the purchase agreement is dated August 30, 1999 and a promissory note to the Duplers is dated August 31, 1999, the funds were not transferred by the Duplers to Myron Kloubec until September 2, 1999, several days after the filing of the bankruptcy petition. The lien notation on the new truck was not made until September 14, 1999. Even though the funds were not tendered and the lien documents were not executed until after the filing of the bankruptcy petition, Debtors' schedules list Thomas and Sandra Dupler as holding a security interest in this new pickup in the amount of $27,000. Why the security interest is for $27,000 when the debt is for $20,999 is unexplained.

Even so, there was more to this transaction. Debtors own a property known as the Ahn Farm. FSB holds a secured interest in this farm in the approximate amount of $70,000. Immediately prior to the filing on their petition, substantial equity existed in this property. However, a second mortgage was filed on this farm literally minutes prior to the filing of the petition.

This mortgage was in favor of Thomas and Sandra Dupler in the amount of $48,000. This mortgage was given as security for the new pickup. Therefore, Schedule D reflects security of $75,000 toward the purchase of a pickup purchased for $20,999.

## PURCHASE OF AMANA SOCIETY STOCK

In December, 1998, Myron Kloubec purchased 500 shares of Amana Society stock allegedly so that he and family members could hunt on Amana land. The purchase price for the 500 shares was approximately $25,000. He borrowed $11,700 from his mother, Evelyn Kloubec. He also borrowed $1,350 from his son, Nicholas, and $4,600 from his brother, Gene Kloubec. A promissory note was executed to his mother in the amount of $15,975 and a promissory note to his son, dated December 2, 1998, in the amount of $1,350. There were no contemporaneous security agreements executed for any of the three loans.

Debtor ultimately executed a security agreement in favor of his mother, Evelyn Kloubec, on March 23, 1999. However, this security agreement granted a security interest in the Estate of William Kloubec in which Myron Kloubec was a beneficiary. There was no reference to a security interest in the Amana stock. Additionally, the interest granted was extremely broad. It provided for all past and future obligations up to the sum of $200,000. Apparently, no security agreements in favor of Nicholas Kloubec or Gene Kloubec exist. Despite the apparent lack of enforceable security agreements, Debtors list these three individuals in Schedule D as holding secured claims. Debtors' initial plan treated these three obligations as secured claims and proposed to pay the claims in their entirety though based merely on promissory notes.

## PROPERTY OF NICHOLAS KLOUBEC

The Schedules reflect that Debtors are holding a substantial amount of property

for the benefit of their 18 year old son, Nicholas Kloubec. He has a pickup truck which is used primarily to go to and from school. Debtors have made a large number of payments on this pickup for the benefit of Nicholas Kloubec over the past year. There is no listing, however, in the schedules of such a gratuitous transfer. There is scheduled, as property of Nicholas Kloubec, a large number of guns. All of the guns, with one exception, were the property of Nicholas Kloubec's grandfather who died in 1992. Myron Kloubec testified that Nicholas's grandfather gave these guns to Nicholas. This would have been at a time when Nicholas was approximately ten years of age. It is the position of the U.S. Trustee that this transfer of ownership to Nicholas Kloubec is not adequately explained and that the guns are, in fact, property of Myron Kloubec.

### CASH COLLATERAL

Debtors filed their Chapter 12 petition on August 31, 1999. Debtors continued to sell fish postpetition. A cash collateral motion was filed and heard. In an order filed October 21, 1999, Debtors were denied use of cash collateral. It was not until October 22, 1999 that Debtors opened a separate debtor-in-possession account. Between the time of the filing of the petition and the order of October 21, 1999, Debtors used an unspecified amount of cash collateral which was security for obligations owing to FSB without Court authority.

### CONCLUSIONS OF LAW

■ The Bankruptcy Code provides that:

(d) On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter or convert a case under this chapter to a case under chapter 7 of this title upon a showing that the debtor has committed fraud in connection with the case.

11 U.S.C. § 1208(d).

In order to find fraud, a court must find that five elements have been proven:

1. the debtor made misrepresentations;

2. that at the time he new they were false;

3. that he made them with the intention and purpose of deceiving the creditor;

4. that the creditor relied on such representations; and

5. that the creditor was damaged as a result of the misrepresentations having been made.

*Ophaug v. Thul (In re Ophaug),* 827 F.2d 340, 342 n. 1 (8th Cir.1987).

*In re Kingsley,* 162 B.R. 249, 253 (Bankr. W.D.Mo.1994).

■ A finding of fraud is dependent upon the facts proven. Fraudulent intent may be inferred from the surrounding circumstances. *In re Graven,* 936 F.2d 378, 383 (8th Cir.1991). Fraudulent intent is presumed in cases in which a debtor has gratuitously conveyed valuable property to another. *In re Schroff,* 156 B.R. 250, 254 (Bankr.W.D.Mo.1993). Once a conveyance has been established by the movant, the burden then shifts to the debtor to prove that debtor's intent was not to hinder, delay or defraud.

■ Case law has developed factors denominated "badges of fraud" which by circumstantial evidence help determine whether a debtor possesses actual intent to defraud. *In re Cohen,* 142 B.R. 720, 728 (Bankr.E.D.Pa.1992). These factors include:

1. lack or inadequacy of consideration;

2. the family, friendship or close associate relationship between the parties;

3. the retention of possession, benefit or use of the property in question, although title exists in a different entity;

4. the financial condition of the parties sought to be charged both before

and after the transaction in question;

5. conveyance of all the debtor's property;

6. secrecy of the conveyance;

7. existence of a trust or trust relationship between the debtor and the person to whom the property was conveyed;

8. the existence or cumulative affect of a pattern or series of transaction or a course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors;

9. the instrument effecting the transfer suspiciously states it is in fact bona fide;

10. debtor makes a voluntary gift to a family member;

11. the general chronology of events and transactions under inquiry.

*Cohen,* 142 B.R. at 728.

### ANALYSIS

The U.S. Trustee has raised numerous claims of misconduct by Debtors which constitute grounds for conversion to a Chapter 7 or dismissal under 11 U.S.C. § 1208(d) of the Bankruptcy Code. The Court will analyze these allegations applying the standards of § 1208(d).

### DISCLAIMER OF INHERITANCE

Myron Kloubec was entitled to a substantial inheritance from the Estate of William Kloubec. Having disclaimed his interest, Myron Kloubec's two children received his interest under Iowa law.

▉▉▉ Debtor argues that a disclaimer of an inheritance is not a transfer of any interest of Debtor so as to form the basis of a claim for fraudulent transfer. The rule in the Northern District of Iowa has been, since 1993, that the disclaimer of an inheritance can form the basis of a fraudulent transfer. The undersigned held in *Agristor Leasing v. Dinsdale,* the following:

The first element of this test requires a transfer of property. This element contains two separate concepts. The concept of transfer, under § 727, is controlled by Federal law. *See* 11 U.S.C. § 101(54); *McKenzie v. Irving Trust Co.,* 323 U.S. 365, 65 S.Ct. 405, 89 L.Ed. 305 (1945). The term "property" is not defined in the Bankruptcy Code and is, therefore, subject to definition under State law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Gervich,* 570 F.2d 247, 251 (8th Cir.1978); *In re Brajkovic,* 151 B.R. 402 (Bankr.W.D.Tex.1993). Ordinarily, these two concepts are subject to ready definition applying appropriate Federal and State definitions. However, this case involves a disclaimer of an inheritance. Most inheritance statutes under State law, including the Iowa Code, involve application of the doctrine of relation back. Iowa Code § 633.704. The Iowa Probate Code allows an individual who would be a legatee to disclaim property or any interest in property if the individual so chooses. In addition to the right to disclaim, the Iowa Probate Code also provides that this disclaimer shall relate back for all purposes to the date of the transfer. This is an acknowledged legal fiction which, for probate purposes, places the effective date of the transfer at the time of the testator's death and thereby prevents any testamentary disposition from passing title to a reluctant legatee.

The most frequently stated reason for the origination of the doctrine of relation-back is to avoid inheritance and gift taxes which were often assessed if a bequest was made and later disclaimed by a legatee. The doctrine eliminates this transfer from the decedent to the legatee. As the law then presumes no transfer at the time of death, no taxable event occurs.

In most contexts, there are few problems of application. However, simultaneous application of the bankruptcy defi-

nition of transfer, the State definition of property, and the fictional doctrine of relation-back results in a completely circuitous analysis. To some extent, defining the issue also focuses the problem. The Bankruptcy Code defines transfer as every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property. 11 U.S.C. § 101(54). Under Iowa law, and the probate law of almost every State which has the Uniform Probate Code, a beneficiary acquires a property interest immediately upon the death of the testator. The Probate Code, as well as case law, establish that at the instant of the death of decedent, title to decedent's property passes to the devisees or heirs of law. *In re Bliven's Estate,* 236 N.W.2d 366 (Iowa 1975); *DeLong v. Scott,* 217 N.W.2d 635 (Iowa 1974); *Brown v. Vonnahme,* 343 N.W.2d 445 (Iowa 1984); Iowa Code § 633.350. Thus, from the instant of death, Debtor had a property interest in his mother's estate. However, when he disclaimed his inheritance, the doctrine of relation-back, for probate purposes, placed the disclaimer prior to the death of the decedent, fictionally eliminating his property interest.

The entire issue involves the effect which should be given to the State doctrine of relation-back. If the doctrine is categorized as a part of the definition of property under State law, the property interest will be determined never to have existed and there is nothing to transfer. However, if the doctrine is considered nothing more than the functional equivalent of a transfer, Federal law controls. The broad definition of transfer, under bankruptcy law, would be applied and the doctrine of relation-back would not be utilized in the definition of property. The result would change substantially. A property interest would be determined to have been created at the time of the death of the decedent and the disclaimer would be defined under Federal bankruptcy law as a transfer.

*Agristor Leasing v. Dinsdale,* Ch. 7, No. L–92–00669–C, 1993 WL 1112064, slip op. at 7 (Bankr.N.D.Iowa, Sept.19, 1993).

At the time of the entry of this ruling and subsequently, there has been a difference of opinion on this issue. Substantial authority holds that the disclaimer of an inheritance is not a transfer which can form the basis of a fraudulent transfer. *See In re Jessen,* 82 B.R. 490 (Bankr. S.D.Iowa 1988); *In re Bright,* 241 B.R. 664 (9th Cir. BAP 1999); *In re Atchison,* 925 F.2d 209 (7th Cir.), *cert. denied* 502 U.S. 860, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991); and *In re Simpson,* 36 F.3d 450 (5th Cir. 1994).

The Eighth Circuit has not previously addressed this issue in the context of bankruptcy. However, in 1998, the Eighth Circuit decided *Drye Family 1995 Trust v. U.S.,* 152 F.3d 892 (8th Cir.1998). While reviewing the case in terms of a Federal tax lien, the Court addresses the identical issue. The Circuit Court framed the issue and response as follows:

The central question undergirding each circuit court's analysis is what law applies: Is a federal court bound by state law governing disclaimers and the "relation back" thereof or does federal law governing the attachment of liens apply? *Leggett* concludes that "state law determines whether a taxpayer has a property interest to which a federal lien may attach." *See Leggett,* 120 F.3d at 594. Similarly, *Mapes* holds that state law concerning property interests and disclaimers determine whether a taxpayer has "property" or a "right to property." *Mapes,* 15 F.3d at 140. However, as we noted earlier, the Supreme Court has pronounced that "once it has been determined that state law creates sufficient interests in the [taxpayer] to satisfy the requirements of [the statute], state law is inoperative," *Bess,* 357 U.S. at 56–57, 78 S.Ct. 1054, and that "[w]hether a state-law right

constitutes 'property' or 'rights to property' is a matter of federal law.' " *Bank of Commerce,* 472 U.S. at 727, 105 S.Ct. 2919 (emphasis added). The principle that emerges from these seemingly contradictory statements is that state law determines whether a given set of circumstances creates a right or interest; federal law then dictates whether that right or interest constitutes "property" or the "right to property" under § 6321. The concomitant state law consequences of a state law interest or right "are of no concern to the operation of the federal tax law." *Id.* at 723, 105 S.Ct. 2919.

By extension, we hold that the state law consequences of Drye's right to his mother's estate, namely, the legal fiction that is created through Drye's disclaimer under Ark.Stat.Ann. § 28-2-101 et seq., is "of no concern to the operation of the federal tax law." *Cf. Bess,* 357 U.S. at 57, 78 S.Ct. 1054 ("Such state laws 'are not laws for the United States ... unless they have been made such by Congress itself.' ") (quoting *Fink v. O'Neil,* 106 U.S. 272, 276, 1 S.Ct. 325, 27 L.Ed. 196 (1882) (concerning bankruptcy liens)); *Leggett,* 120 F.3d at 596 ("The view that the disclaimer is a legal fiction ... supports the holding that property right existed before the disclaimer."); *Terwilliger's Catering Plus,* 911 F.2d at 1171-72 ("Although it is true that the state has the right to decide what property interests it wishes to create, it cannot thwart the operation of the Tax Code by classifying the interests it has created as something other than property rights."). Under this view, we conclude that the preexisting federal tax liens attached to Drye's state law right to his intestate share which vested on or about the time of his mother's death.

*Drye,* 152 F.3d at 897.

This ruling was appealed to the United States Supreme Court. The case was decided on December 7, 1999 and holds that:

The Eighth Circuit, with fidelity to the relevant Code provisions and our case law, determined first what rights state law accorded Drye in his mother's estate. It is beyond debate, the Court of Appeals observed, that under Arkansas law Drye had, at his mother's death, a valuable, transferable, legally protected right to the property at issue. *See* 152 F.3d, at 895 (although Code does not define "property" or "rights to property," appellate courts read those terms to encompass "state-law rights or interests that have pecuniary value and are transferable"). The court noted, for example, that a prospective heir may effectively assign his expectancy in an estate under Arkansas law, and the assignment will be enforced when the expectancy ripens into a present estate. *See id.,* at 895-896 (citing several Arkansas Supreme Court decisions, including: *Clark v. Rutherford,* 227 Ark. 270, 270-271, 298 S.W.2d 327, 330 (1957); *Bradley Lumber Co. of Ark. v. Burbridge,* 213 Ark. 165, 172, 210 S.W.2d 284, 288 (1948); *Leggett v. Martin,* 203 Ark. 88, 94, 156 S.W.2d 71, 74-75 (1941)).

In recognizing that state-law rights that have pecuniary value and are transferable fall within § 6321, we do not mean to suggest that transferability is essential to the existence of "property" or "rights to property" under that section. For example, although we do not here decide the matter, we note that an interest in a spendthrift trust has been held to constitute " 'property' for purposes of § 6321" even though the beneficiary may not transfer that interest to third parties. *See Bank One,* 80 F.3d at 176. Nor do we mean to suggest that an expectancy that has pecuniary value and is transferable under state law would fall within § 6321 prior to the time it ripens into a present estate.

Drye emphasizes his undoubted right under Arkansas law to disclaim the in-

heritance, *see* Ark.Code Ann. § 28–2–101 (1987), a right that is indeed personal and not marketable. See Brief for Petitioners 13 (right to disclaim is not transferable and has no pecuniary value). But Arkansas law primarily gave Drye a right of considerable value—the right either to inherit or to channel the inheritance to a close family member (the next lineal descendant). That right simply cannot be written off as a mere "personal right ... to accept or reject [a] gift." Brief for Petitioners 13.

In pressing the analogy to a rejected gift, Drye overlooks this crucial distinction. A donee who declines an inter vivos gift generally restores the status quo ante, leaving the donor to do with the gift what she will. The disclaiming heir or devisee, in contrast, does not restore the status quo, for the decedent cannot be revived. Thus the heir inevitably exercises dominion over the property. He determines who will receive the property—himself if he does not disclaim, a known other if he does. *See* Hirsch, *The Problem of the Insolvent Heir,* 74 Cornell L.Rev. 587, 607–608 (1989). This power to channel the estate's assets warrants the conclusion that Drye held "property" or a "righ[t] to property" subject to the Government's liens.

*Drye v. U.S.,* —— U.S. ——, ——–—–——, 120 S.Ct. 474, 482–83, 145 L.Ed.2d 466 (1999).

■ Debtors assert that as *Drye* involves tax liens, it is distinguishable from issues raised in the bankruptcy context. However, it is the conclusion of this Court that, even though *Drye* was a tax lien case, the issue decided was identical to the issue presented here, that is, whether the state doctrine of relationship-back can modify rights created under Federal statutes. The U.S. Supreme Court held unambiguously that this artificially-created state doctrine cannot modify a substantive Federal statute. There is nothing in the opinion to suggest that its clearly articulated

ruling is limited to a tax lien application. To the contrary, the opinion broadly suggests that, in all contexts, the result would be the same.

It is the conclusion of this Court that the disclaimer of inheritance filed by Myron Kloubec the day prior to the filing of the bankruptcy petition was a fraudulent transfer. In making the disclaimer, he channeled an inheritance worth at least $85,000 from the bankruptcy estate into the hands of Debtors' children. The result is that unsecured creditors are denied distribution of this asset and Debtors continue to have control over it through their children.

## UNLISTED ASSETS

The record establishes that Debtors have failed to list a substantial number of assets though the exact total value is unclear. A rough estimate reflects unlisted assets with a value between $25,000 and possibly as much as $50,000. The value is difficult to determine with certainty because of the resistance of Debtors to fully set out their statement of affairs.

■ Debtors testified that they attempted to list all assets to the best of their ability and were told that they could go back and amend if they omitted any assets from the original schedules. As of the time of the entry of this ruling, Debtors have not amended their schedules in any respect. Courts have held that: "Debtor's failure to promptly amend the schedules is considered a reckless indifference to the truth which is the equivalent of fraud." *In re Alfonso,* 94 B.R. 777, 778 (Bankr.S.D.Fla.1988).

■ The Court notes that the property which has been discovered as unlisted is substantial in value, even though it is the failure to list assets and not the amount which is relevant. *In re Davis,* 911 F.2d 560, 562 (11th Cir.1990). Fraudulent intent may be inferred from the surrounding circumstances.

■ This Court has been involved in numerous hearings in this case in which Debtors have contested almost every issue. The production of accurate records and information has been acquired from Debtors only after strenuous effort. The Court has had an opportunity to observe all of this conduct as well as the demeanor of Debtors as witnesses. There has been no evidence presented which the Court feels justifies the failure of Debtors to list the substantial amount of assets missing from their schedules. Even after substantial discovery, the Court is left with the uneasy feeling that a full and complete listing of all assets and liabilities still has not been forthcoming. Debtors' failure to amend their schedules is some indication of their continued reluctance to be forthright.

The failure to accurately disclose all assets undermines the entire bankruptcy process. "The damage in this case is the inability of the court, the standing trustee, and the creditors to rely upon the accuracy of [debtors] schedules." *In re Calder,* 93 B.R. 734, 737 (Bankr.D.Utah 1988). Ultimately, this Court is satisfied that the U.S. Trustee has met the burden of proof. The Court is left with an overriding conviction that Debtors intentionally and fraudulently attempted to conceal assets from the Court, the Trustee, and the creditors in this case.

### OTHER ACTS

Debtors attempted to transfer ownership of a vehicle shortly before filing their petition. However, they failed to complete the transaction prepetition. Their obvious intent was to dispose of an unsecured and non-exempt asset in favor of an asset secured to relatives. In addition, Debtors misrepresented the transaction by noting a $27,000 lien on the new vehicle instead of the actual loan amount of $20,999.

Debtors misrepresented the entire status of the transaction by listing in the schedules that the transaction had occurred before the filing of the petition, even though it was not completed until

well after the filing of the petition. Completion of the sale after the filing of the petition arguably voids any security interest thereby leaving the loan by the Duplers unsecured. Even so, Debtors continued to treat this as a secured obligation, both in their schedules and in their plan. Finally, Debtors completed this transaction after the filing of the petition. This was done without Court approval and was, therefore, in violation of the Code.

In addition, Debtors attempted to reduce their liquidity by adding another mortgage on the Ahn Farm. They did this by purporting to take a second mortgage on the Ahn Farm and use that as additional security on the newly purchased truck which was already oversecured. Again, the purpose was clearly to camouflage the equity in the Ahn Farm. This purported mortgage was in the amount of $48,000. In their plan, Debtors did nothing to reveal this inequitable situation.

In addition to the misrepresentations inherent in the purchase of the F–550 Ford truck, the schedules and plan also misrepresent Debtors' interest in Amana Society stock. While Debtors executed promissory notes for the loans used to purchase the stock, no valid security interests ever existed. The notes were, at all times and continued to be at the time of the filing of the petition, unsecured obligations. Nevertheless, the schedules purport to raise these obligations to the status of secured debt. The practical effect of the failure to Debtors to properly schedule this debt and properly treat it in the plan was to eliminate approximately $25,000 of non-exempt assets from unsecured creditors while, at the same time, funneling $25,000 in assets into the hands of relatives.

Debtors scheduled substantial assets as belonging to their son Nicholas Kloubec. Their son drives a relatively new truck. Many payments for this truck were made by Debtors. Wages were paid to Nicholas Kloubec during the year which were treated by Mrs. Kloubec as gifts. Additionally,

Nicholas Kloubec is listed as the owner of a gun collection which originally belonged to his grandfather. There is no satisfactory explanation in the record as to how he came in possession of this entire gun collection. Again, the practical effect of these transfers is to place in the hands of a relative, possession of non-exempt unsecured assets which should be dedicated for payment to unsecured creditors.

Finally, accounts receivable of the fish farm operation were collateral for FSB's loans. The evidence reflects that fish were sold and accounts were collected after the filing of the petition. However, the debtor-in-possession account was not opened until one day after this Court's order prohibiting the use of cash collateral. In other words, the petition was filed on August 31, 1999 and the debtor-in-possession account was opened on October 22, 1999. By Debtors' own admission, fish sales occurred and accounts receivable were collected between those dates during which time no debtor-in-possession account existed, all in violation of 11 U.S.C. § 364.

To establish fraud, the Court must find that knowingly false misrepresentations were made and that they were made with the intention of deceiving others. In this series of transactions, the Court is satisfied that the U.S. Trustee has shown that each of these acts individually and collectively constitute misrepresentations to the Court, to the creditors, and to the Trustee. The Court is satisfied that they were knowingly false and done with the intention of deceiving all interested parties to improve their financial posture at the expense of creditors. The Court finds that each act listed herein individually and collectively constitutes fraud.

## SUMMARY

Chapter 12 was promulgated to allow family farmers to reorganize their obligations. However, to achieve the benefits of Chapter 12, Debtors must act in good faith and must deal honestly with the Court and with their creditors. Section 1208 was written into Chapter 12 in order to address those instances where Debtors attempt to take advantage of the system to the detriment of creditors. In order to convert a case from Chapter 12 to Chapter 7, § 1208(d) requires a showing of fraud. Fraud requires a showing that Debtors knowingly misrepresented their financial picture with the intent to improve their financial position at the expense of creditors. The case law has developed criteria which can be used as a gauge to determine whether fraud has occurred.

The Court is satisfied that the moving parties have established a concerted pattern of conduct designed to misrepresent the financial picture of Debtors, thereby keeping liquid assets out of the hands of unsecured creditors. Debtors' former counsel testified that the purpose of estate planning is to modify the financial picture of a debtor in order to satisfy the liquidation analysis test. It is apparent in this case that Debtors took extraordinary steps to channel unsecured and nonexempt assets from the estate. The Court will not go into each of the badges of fraud individually. In general terms, upon examination, almost every indicia of fraud is met in this case. Through a deliberate course of conduct, Debtors gave family members assets, liens, or security interests in an attempt to remove those assets from the pool of funds available for unsecured creditors.

While conversion to a Chapter 7 liquidation is a harsh result, it is specifically for conduct of this type that § 1208 was designed. As debtors-in-possession, Debtors have shown that they are not concerned with the rights of creditors. They have shown concern solely for themselves and for utilizing the system for their own benefit. This is best exemplified by the fact that Debtors eliminated as much as $250,000 from the estate for possible distribution to unsecured creditors. Even though Debtors still retained $63,000 in net assets under their own liquidation analysis, they were only willing to propose payment to

unsecured creditors of $30,000 in their plan. Such conduct shows a complete lack of good faith. It establishes that a trustee, concerned with the welfare of the creditors, must be appointed to secure the greatest dividend possible for creditors. For all of the reasons set forth herein, the Court finds that the U.S. Trustee has satisfied the burden set forth in 11 U.S.C. § 1208(d) and this case must be converted to a Chapter 7.

### MOTION TO DISMISS

A Motion to Dismiss was filed by FSB. This Motion presents the issue of whether the various business activities of Debtors constitute a farming operation within the meaning of Chapter 12. Debtors have a fish farm operation. In addition to this activity, Debtors are involved in a bait business. This involves all types of bait. It is not limited solely to fish raised on the premises. FSB asserts that the Kloubec Farm operation does not generate farm income sufficient to meet the requirements of Chapter 12. However, this Court has now ruled on the Motion to Convert and has concluded that this case will be converted to Chapter 7. As such, the Motion to Dismiss is now moot.

Even if this Court would consider the merits of the Motion to Dismiss and found that the Motion had merit, the Court would ultimately weigh the advantages of dismissal or conversion. Under such an analysis, it must ultimately be the conclusion of this Court that because of the numerous potential preferences in this case, the only protection for the benefit of creditors is through the appointment of a Trustee who can pursue assets for the ultimate benefit of all creditors. Therefore, the Motion to Dismiss is now moot. Even if established to have merit, the Motion to Convert is the most appropriate choice.

**WHEREFORE,** for all of the reasons set forth herein, the Court concludes that the Motion to Dismiss filed by Farmers Savings Bank is MOOT.

**FURTHER,** for all of the reasons set forth herein, the Motion of the U.S. Trustee to convert this case from Chapter 12 to Chapter 7 under 11 U.S.C. § 1208 is GRANTED.

**FURTHER,** this case is converted from Chapter 12 to Chapter 7.